## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JOSEPH P. AUSIKAITIS, derivatively on                )
behalf of MASIMO CORPORATION,                        )
                                                     )
                                                     )
                        Plaintiff,                   )    Civil Action No.
                                                     )
            vs.                                       )
                                                     )
JOE KIANI, STEVEN J. BARKER,                         )
EDWARD L. CAHILL, ROBERT                             )
COLEMAN, JACK LASERSOHN,                             )
SANFORD FITCH, JON COLEMAN, MARK                     )    **JURY TRIAL DEMANDED**
P. DE RAAD, RICK FISHEL, YONGSAM                     )
LEE, and ANAND SAMPATH,                              )
                                                     )
                        Defendants,                   )
                                                     )
            -and-                                     )
                                                     )
MASIMO CORPORATION, a Delaware                       )
Corporation,                                         )
                                                     )
                                                     )
                        Nominal Defendant.            )

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Joseph Ausikaitis ("Plaintiff") alleges, upon information and belief based upon,

*inter alia*, the investigation made by and through his attorneys, except as to those allegations that

pertain to the Plaintiff himself, which are alleged upon knowledge, as follows:

1.      Plaintiff brings this action derivatively in the right of, and for the benefit of,

nominal defendant Masimo Corporation ("Masimo" or the "Company) against Masimo's board

of directors (the "Board") and certain of its executive officers (collectively, the "Defendants" as

individually defined below) to remedy Defendants' breaches of fiduciary duties which have

caused, and will continue to cause, damage to Masimo. This action arises out of Defendants' conduct of repeatedly authorizing, or through abdication of duty permitting and/or accepting, stock options grants in violation of Masimo's applicable stock plan and the policies adopted to implement the plan.

2.     A stock option granted to a director, officer, or employee of a corporation allows the recipient to purchase the corporation's stock at a specified price – referred to as the "exercise price" – for a specified period of time.  Stock options are granted as part of compensation packages as a means to create incentives to boost corporate profitability and stock value.

3.     The granting of stock options to Masimo's directors, officers, and employees are subject to a number of restrictions:

a)     Masimo's 2007 Stock Incentive Plan (the "2007 Plan"), which has been in place since the Company's initial public offering ("IPO") in August 2007, requires that the exercise price of stock options cannot be less than the "fair market value" of Masimo common stock on the date of the grant, with "fair market value" being defined as the closing price of Masimo common on the Nasdaq Stock Market, Inc. ("NASDAQ") on the date of the grant.  This method ensures that employees have an incentive to work to increase the market price of the company's stock since their options are worthless until the market price increases.

b)     The 2007 Plan prohibits the "repricing" of stock options, absent shareholder approval.  "Repricing" of stock options generally refers to a company's decision to reduce the exercise prices of "underwater" options (that is, options with exercise prices that exceed the current fair market value of the underlying stock) held by their directors, officers, and employees, either by means of an amendment to the exercise price of the outstanding stock options or by an exchange of new, lower-priced options for the outstanding, underwater options.

2

Repricing benefits the Company's directors, officers, and employees, by enabling them to exchange their worthless underwater options caused by a decline in the company's stock price for new options at a lower exercise price.

c)      In implementing the 2007 Plan, the Board adopted a non-employee director compensation policy (the "Director Compensation Policy"), which was most recently amended December 15, 2008.  The Director Compensation Policy limits stock options grants to non-employee directors to an annual grant of 20,000 shares.

d)      The Board also adopted a CEO and Executive Officer Equity Award Compensation Policy (the "Executive Officer Compensation Policy"), which was most recently amended January 4, 2009.   The Executive Officer Compensation Policy limits the stock option grants to Joe Kiani, the Company's Chief Executive Officer ("CEO") to an annual grant of 100,000 stock options, and further provides that all other executive officers are eligible to receive an annual grant of stock options in the discretion of the Compensation Committee.

4.      The Board has claimed that the 2007 Plan and its policies are "effective in implementing [Masimo's] compensation philosophy and in achieving its goals" and are "sound and in [Masimo's] best interests and in the best interests of [Masimo's] stockholders." Despite these claims, however, in each full year since the Company's IPO, the Board has repeatedly violated the 2007 Plan, the Director Compensation Policy, and the Executive Officer Compensation Policy when granting stock options to themselves and the other Defendants.

5.      Between 2008 and 2010, the Board's Compensation Committee (the "Compensation Committee") did not make their annual stock option grants at any regularly-scheduled, predetermined dates. Rather, the Compensation Committee waited patiently to opportunistically time stock option grants to themselves and the other Defendants at a time when

the closing price of the Company's stock price (the price used to set the exercise price) was trading at a discount to the Company's true fair market value, thus violating the terms of the 2007 Plan.

6.      Specifically, in early February 2008, the Company's common stock – for no apparent reason and with no earnings or other news released by the Company – suddenly dropped 7.65% and 5.13% in consecutive trading days, two of the largest one-day drops in the Company's history at the time.  The Compensation Committee quickly acted, and made the annual stock options grants to Kiani and certain other executive officers while the stock price was still temporarily depressed.

7.      Similarly, the following year, on Friday, January 9, 2009, the Company's stock price – again, for no apparent reason – suddenly dropped 9.08%, from an open of $26.18 per share to a close of $23.92 per share, at the time the sixth largest one-day drop in the Company's history. In response to this event, the Compensation Committee quickly arranged to meet on *Sunday*, January 11, 2009, to make the annual stock options grants to themselves and certain other Defendants, setting the exercise price at $23.98 per share. By the time the market opened on Monday, the Company's stock price quickly rose, but the Compensation Committee had already succeeded in granting the annual stock options at the artificially low exercise price.

8.      In 2010, the Compensation Committee granted themselves and the other Defendants their annual grant of stock options just prior to the release of favorable financial information. Through this method, the Compensation Committee was able to once again ensure that the option recipients received an option with an artificially enhanced value, on which the market price (and thus, the exercise price), was lower than it should have been, given the

favorable information that was known to the Company at the time of the grant and that was to be made public soon after the grant.

9.      Defendants' actions were even more egregious in 2011, whereby they essentially redefined the term "annual." On February 22, 2011, the Compensation Committee made the annual grant of stock options to themselves and the other Defendants at an exercise price of $30.06 per share, the closing price of the Company's common stock on that date (the "February 2011 Grant"). Kiani was granted 300,000 stock options; non-employee directors were each granted 20,000 options; and certain other executive officers were also granted varying amounts of stock options.

10.     Over the following eight months, the Company's stock price decreased substantially to close at $22.32 per share on October 25, 2011. On that date, the Company released poor quarterly financial results that failed to meet analyst expectations, and lowered its financial guidance for the 2011 fiscal year. Following the release of the financial results and the revised guidance, the Company's stock price dropped 10.3% from $22.32 per share on October 25, 2011 to close at $20.02 per share on October 26, 2011 and $20.12 per share on October 27, 2011. The 10.3% one-day drop equated to the fourth largest one-day drop in the Company's history.

11.     On October 27, 2011, in violation of the restrictions set out in both the Director Compensation Policy and the Chief Executive Officer Compensation Policy, the Compensation Committee inexplicably made a second "annual" round of stock option grants to themselves and the other Defendants, with non-employee directors receiving another 20,000 stock options, Kiani receiving another 300,000 stock options, and the other executive officers also receiving stock option grants at varying amounts (the "October 2011 Grant"). Moreover, with the value of the

February 2011 Grant virtually worthless due to the 32.83% decrease in the Company's stock price during the prior 8 months, the October 2011 Grant effectively replaced the February 2011 Grant, and in essence, represented a "repricing" of stock options, which is prohibited pursuant to the terms of the 2007 Plan absent shareholder approval.

12.     Additionally, while the Chief Executive Officer Compensation Policy limited stock option grants to Kiani at 100,000 options a year, the Compensation Committee granted Kiani 300,000, 300,000, 300,000, and 600,000 stock options in years 2008 through 2011 respectively, thus violating the policy limit each year.

13.     Moreover, as described in more detail below, the Defendants also made numerous false and misleading statements concerning the Company over the course of the year, including in documents filed with the SEC.  Among other things, these false and misleading statements deceptively conveyed the impression that the Company was properly implementing the 2007 Plan and its policies when granting stock options.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. Plaintiff is a citizen of Massachusetts and no defendant is a citizen of Massachusetts.

15.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16.     Venue is proper in this district because nominal defendant Masimo is incorporated in this district.

## THE PARTIES

17.     Plaintiff Joseph P. Ausikaitis is a shareholder of Masimo and has been continuously since November 2007.

18.     Nominal party Masimo Corporation is a Delaware corporation with its principal place of business located at 40 Parker, Irvine, California 92618.

19.     Defendant Joe Kiani ("Kiani") is the CEO of Masimo and has served as Chairman of the Board since its founding in 1989. Kiani personally benefited from the 2008-2011 stock option grants challenged herein. Kiani is a resident of California.

20.     Defendant Steven J. Barker ("Barker") has served on the Board since October 2005.  Defendant Barker has been a member of the Compensation Committee since the Company's IPO. Barker personally benefited from the 2009-2011 stock option grants challenged herein.  Barker is a resident of Arizona.

21.     Defendant Edward L. Cahill ("Cahill") has served on the Board since January 1999.  Cahill personally benefited from the 2009-2011 stock option grants challenged herein. Cahill is a resident of California.

22.     Defendant Robert Coleman ("R. Coleman") has served on the Board since February 1997.  Defendant R. Coleman is chairman of the Compensation Committee, and has served on the Compensation Committee since the Company's IPO.  R. Coleman personally benefited from the 2009-2011 stock option grants challenged herein. R. Coleman is a resident of Kentucky.

23.     Defendant Jack Lasersohn ("Lasersohn") has served on the Board since January 1995. Defendant Lasersohn has served as a member of the Compensation Committee since the

Company's IPO. Lasersohn personally benefited from the 2009-2011 stock option grants challenged herein. Lasersohn is a resident of New York.

24.     Defendant Sanford Fitch ("Fitch") has served on the Board since November 2006. Fitch personally benefited from the October 2011 Grant challenged herein. Fitch is a resident of California.

25.     Defendants Kiani, Barker, Cahill, Coleman, Lasersohn, and Fitch are hereinafter sometimes referred to collectively as the "Board" or the "Director Defendants." Defendants Barker, R. Coleman and Lasersohn are hereinafter sometimes referred to collectively as the "Compensation Committee" or the "Compensation Committee Defendants."

26.     Defendant Jon Coleman ("J. Coleman") has served as Masimo's President, Worldwide Sales, Marketing and Clinical Research, since February 2011. J. Coleman personally benefited from the October 2011 Grant challenged herein. J. Coleman is a resident of California.

27.     Defendant Mark P. de Raad ("de Raad") has served as Masimo's Executive Vice President and Chief Financial Officer since June 2006 and Corporate Secretary since December 2009.  De Raad personally benefited from the 2009-2011 stock option grants challenged herein. De Raad is a resident of Arizona.

28.     Defendant Rick Fishel ("Fishel") has served as Masimo's President for Worldwide OEM Business and Strategic Development since February 2011. Fishel personally benefited from the 2009-2011 stock option grants challenged herein.  Fishel is a resident of California.

29.     Defendant Yongsam Lee ("Lee") has served as Masimo's Chief Information Officer and Executive Vice President, Regulatory Affairs since November 2010. Lee personally

benefited from the 2008-2011 stock option grants challenged herein. Lee is a resident of California.

30.     Defendant Anand Sampath ("Sampath") has served as Masimo's Executive Vice President, Engineering, since March 2007.  Sampath personally benefited from the October 2011 Grant challenged herein. Sampath is a resident of California.

31.     Defendants Kiani, Coleman, de Raad, Fishel, Lee and Sampath are hereinafter sometimes referred to collectively as the "Officer Defendants."

## FURTHER SUBSTANTIVE ALLEGATIONS

32.     Masimo is a medical technology company that develops, manufactures, and markets noninvasive patient monitoring products worldwide. The Company offers Masimo Signal Extraction Technology (SET), which provides the capabilities of measure-through motion and low perfusion pulse oximetry to address the primary limitations of conventional pulse oximetry, and Masimo rainbow SET products that monitor multiple blood measurements, including oxygen content, carboxyhemoglobin, methemoglobin, hemoglobin, pleth variability index, respiration rate, Halo Index, and In Vivo Adjustment. Masimo develops, manufactures, and markets a family of patient monitoring solutions comprising circuit boards, monitors, devices, sensors, and cables; Masimo SafetyNet, a remote monitoring and clinician notification system; and software for Rainbow measurements, as well as other future measurements or features. Masimo was founded in 1989 and is headquartered in Irvine, California.  Masimo commenced its IPO on August 7, 2007 and is traded on the NASDAQ.

### *Masimo's 2007 Stock Incentive Plan*

33.     The Board adopted the 2007 Plan in November 2006. The 2007 Plan was approved by the Company's stockholders in June 2007 and became effective on the date of Masimo's IPO on August 7, 2007.

9

34.    The 2007 Plan permits the grant of stock options, stock appreciation rights, restricted stock, restricted stock units, performance units, performance shares, and other stock-based awards. The Company's officers, employees, and directors are eligible to receive awards under the 2007 Plan. The stock option grants described herein were all issued under the 2007 Plan.

35.    The 2007 Plan states that the Board can appoint a committee to administer the plan, and further states that the Board can "act in lieu of the [c]ommittee on any matter." As described in Masimo's Schedule 14A Proxy Statement filed with the Securities and Exchange Commission (the "SEC") on April 27, 2012 (the "2012 Proxy"): "The 2007 Plan is administered by the Compensation Committee of our Board, provided that our Board may act in lieu of the Compensation Committee on any matter."

36.    With respect to the granting of stock options, the 2007 Plan provides that the exercise price for stock options cannot be less than 100% of the "Fair Market Value" of Masimo common stock on the date of the grant. Specifically, section 6(d) of the 2007 Plan provides as follows:

> (d) *Exercise Price.* The exercise price of an Option shall be determined by the Committee in its sole discretion and shall be set forth in the Award Agreement, provided that:
>
> > (i) if an ISO is granted to an Employee who on the Grant Date is a Ten Percent Holder, the per Share exercise price shall not be less than 110% of the Fair Market Value per Share on the Grant Date; and
> >
> > (ii) for all other Options, such per Share exercise price shall not be less than 100% of the Fair Market Value per Share on the Grant Date.

37.    "Fair Market Value" is defined in the 2007 Plan to mean the closing price of Masimo common stock on the NASDAQ on the date of the grant.  This method ensures that the

recipient of the stock options has an incentive to work to increase the market price of the Company's stock.

38.     The 2007 Plan also prohibits the repricing of stock options without stockholder approval. As stated in section 6(d): "Neither the Company nor the Committee shall, without stockholder approval, allow for a repricing of Options within the meaning of the federal securities laws applicable to proxy statement disclosures." "Repricing" of stock options generally refers to a company's decision to reduce the exercise prices of "underwater" options (that is, options with exercise prices that exceed the current fair market value of the underlying stock) held by their employees, officers, and directors, either by means of an amendment to the exercise price of the outstanding stock options or by an exchange of new, lower-priced options for the outstanding, underwater options. Repricing benefits the Company's employees, officers, and directors who would be able to exchange their worthless underwater options caused by a decline in the company's stock price for new options at a lower exercise price. Meanwhile, the Company's shareholders get no reprieve from the stock price decline.

### *Masimo's Compensation Policies*

39.     To implement the 2007 Plan, the Board adopted a number of compensation policies.

40.     The Board has adopted a non-employee director compensation policy, which was most recently amended effective December 15, 2008. Pursuant to the Director Compensation Policy, the Compensation Committee has been provided with authority to award a non-employee director an annual grant of stock options to purchase up to 20,000 shares of Masimo's common stock. As stated in the 2012 Proxy:

> Our Board has adopted the following policy with respect to granting stock options
> to non-employee directors. Our Audit Committee chairperson received a stock

option grant for 150,000 shares of common stock, which vests at a rate of 20% per year. Upon first becoming a member of our Board of Directors, unless otherwise determined by our Compensation Committee, each non-employee director other than our Audit Committee chairperson receives an option to purchase 50,000 to 100,000 shares of our common stock that vests at a rate of 20% per year on each anniversary of the grant date. Our Compensation Committee will determine the size of the award to be made. ***Upon the vesting of 60% of the initial option award to our Audit Committee chairperson and other outside directors, our Compensation Committee will provide our Audit Committee chairperson or other outside director, as applicable, an additional annual option grant to purchase 20,000 shares that vest at a rate of 20% per year on each anniversary of the grant date.*** Through March 15, 2012, we granted to our current non-employee directors options to purchase an aggregate of 1,615,000 shares of common stock under our 1996 Plan, 2004 Plan and 2007 Plan. In the year ended December 31, 2011, we granted to our non-employee directors options to purchase an aggregate of 180,000 shares of our common stock under our 2007 Plan. All awards made to our non-employee directors in the future will be made under our 2007 Plan or a successor plan. For a more detailed description of this plan, see "Compensation of Executive Officers—Employee Benefit Plans—2007 Stock Incentive Plan." We did not grant any type of equity award other than stock options to our non-employee directors during the year ended December 31, 2011. Our Audit Committee chairperson was the only non-employee director who received cash compensation for his Board and committee service in fiscal 2011.

[Emphasis Added].

41.     In May 2007, the Board adopted the Executive Officer Compensation Policy, which was most recently amended January 4, 2008.

42.     Pursuant to the terms of the Executive Officer Compensation Policy, the CEO, in this case Kiani, is subject to the policy and will be entitled to receive an annual grant of stock options "to purchase an aggregate of 100,000 shares of Common Stock (as adjusted for stock splits, stock dividends, recapitalizations and similar transactions occurring on or after the Effective Date)." With respect to the other executive officers, the Executive Officer Compensation Policy provides that the Compensation Committee may select officers to be subject to the policy. If selected, the officer will be eligible to receive an "annual grant" of stock options in an amount determined by the Compensation Committee.

43.    Specifically, the Executive Officer Compensation Policy states:

**EQUITY COMPENSATION**

In order to provide the Chief Executive Officer and the other executive officers of Masimo Corporation (the "Corporation") with a long-term incentive compensation award, the Compensation Committee of the Board of Directors of the Corporation (the "Committee") has established this CEO and Executive Officer Equity Award Compensation Policy (the "Policy").

**ELIGIBILITY**

*The Chief Executive Officer hereby is, and shall always be, subject to the Policy*. The Committee shall set by resolution from time to time the names and titles of other executive officers of the Company who shall be subject to the Policy. A person subject to the Policy shall hereinafter be referred to as a "Policy Participant" and persons subject to the Policy collectively referred to as the "Policy Participants."

Each Policy Participant *shall become eligible to receive an annual option grant* of a non-qualified stock option to purchase shares of Common Stock of the Company ("Common Stock") commencing upon (i) the effective date of this Policy (the "Effective Date"), for each Policy Participant who has at any time prior to the Effective Date become vested as to at least 60% of the shares of Common Stock subject to a stock option granted by the Company to such Policy Participant, and (ii) for all other Policy Participants, the first date that such Policy Participant becomes vested as to at least 60% of the shares of Common Stock subject to a stock option granted by the Company to such Policy Participant (such Policy Participant's initial eligibility date, the "Eligibility Date").

**ANNUAL GRANTS**

*Chief Executive Officer*

Commencing on the Eligibility Date for the Chief Executive Officer, and each anniversary thereafter, the Chief Executive Officer *shall be entitled to receive an annual grant of a non-qualified stock option to purchase an aggregate of 100,000 shares of Common Stock (as adjusted for stock splits, stock dividends, recapitalizations and similar transactions occurring on or after the Effective Date)*, that vests at a rate of 20% per year, with an exercise price equal to 100% of the fair market value (as defined under the applicable stock option plan pursuant to which the grant was made) of one share of Common Stock on the date of grant. *Each such option shall be granted at the first meeting held, or action by unanimous written consent taken, by the Committee on or after the Chief Executive Officer's Eligibility Date, or anniversary thereof*, as applicable, at which time the Company is not subject to a trading blackout under its Insider Trading and Window Period Policy.

*Other Policy Participants*

Commencing on the Eligibility Date for each other Policy Participant, and each anniversary thereafter, such other Policy Participant *shall be entitled to receive an annual grant* of a non-qualified stock option to purchase that number of shares of Common Stock determined by the Committee, which option shall vest at a rate of 20% per year and have an exercise price equal to 100% of the fair market value (as defined under the applicable stock option plan pursuant to which the grant was made) of one share of Common Stock on the date of grant. *Each such option shall be granted at the first meeting held, or action by unanimous written consent taken, by the Committee on or after the Eligibility Date for such other Policy Participant, or anniversary thereof*, as applicable, at which time the Company is not subject to a trading blackout under its Insider Trading and Window Period Policy.

[Emphasis Added].

44.     As described in the 2012 Proxy, the Compensation Committee and the Board believe that these policies are "effective in implementing [Masimo's] compensation philosophy and in achieving its goals." The 2012 Proxy further states that these policies are "sound and in [Masimo's] best interests and in the best interests of [Masimo's] stockholders."

45.     Despite these claims, however, in each full year since the Company's IPO, the Board has repeatedly violated the 2007 Plan, the Director Compensation Policy, and the Executive Officer Compensation Policy when granting stock options to themselves and the other Defendants.

### *Masimo's Historical Stock Option Grants*

46.     Between 2008 and 2010, the Compensation Committee did not make their annual stock option grants at any regularly-scheduled, predetermined dates. Rather, the Compensation Committee waited patiently to opportunistically time stock option grants to themselves and the other Defendants at a time when the closing price of the Company's stock price (the price used to set the exercise price) was trading at a discount to the Company's true fair market value, thus violating the fundamental goal of the 2007 Plan -- to encourage executives to work towards increasing the Company's share price.

47.    In 2008, the first full year since the Company's IPO, the Compensation Committee granted Kiani and certain other executive officers their annual grant of stock options on February 7, 2008. Kiani was granted 300,000 shares (200,000 shares more than he was entitled to under the Executive Officer Compensation Policy), and executive officers Lee, Amar Al-Ali and Michael O'Reilly were each granted 30,000, 150,000 and 100,000 stock options, respectively. The exercise price of the stock options was $30.79 per share, the closing price of the Company's common stock on February 7, 2008.

48.    The Compensation Committee made these grants immediately following two of the largest single stock price declines in the Company's history at the time. Specifically, on February 1, 2008, Masimo stock dropped 7.65% from $35.68 per share to close at $32.96 per share, at the time the second largest one-day decline in the Company's history. The very next trading day, the Company's stock price declined another 5.13% to close at $31.27 per share on February 4, 2008. The stock price decline had no observable cause. The Company did not release any earnings announcements during the week preceding the stock price drop, and no negative treatment of the Company was prominently featured in the news or by analysts. During the sudden two-day drop in Masimo's stock price, the S&P 500, Dow Jones, and NASDAQ, each moved less than half a percent.  Accordingly, the Compensation Committee waited until the most opportune time to make the stock option grants; a time when the closing price of the Company's stock price was trading at a discount to its true fair market value, thereby transgressing the express terms and purpose of the 2007 Plan. Indeed, within a week of the stock option grant the Company's stock price had already increased to close to $31.61 per share on February 14, 2008. By February 27, 2008, the Company's stock price had already reached a close of $33.75 per share.

49.    The Compensation Committee repeated a similar tactic in 2009. On Friday, January 9, 2009, the Company's stock price suddenly dropped 9.08%, from an open of $26.18 per share to a close of $23.92 per share, at the time the sixth largest one-day decline in the Company's history. As in 2008, there was no observable cause or apparent reason for the stock price decline. The Compensation Committee quickly arranged to meet on Sunday, January 11, 2009. On this date, the Compensation Committee granted themselves, and the Company's non-employee directors and executive officers their annual stock option grants at an exercise price of $23.98 per share. Specifically, Kiani was granted 300,000 options (again, 200,000 more than allowed under the Executive Officer Compensation Policy); non-employee directors Barker, Cahill, R. Coleman and Lasersohn were each granted 20,000 options; and executive officers de Raad, Fishel and Lee were each granted 30,000 options. These option grants were again made at a time when the Company's stock was trading at a discount to its recent trading price. Indeed, when the market opened on January 12, 2009, the Company' stock quickly rose, closing at $24.38 on Janury 12, 2009, $25.36 per share on Janury 13, 2009, and $27.50 per share by the end of the week.

50.    In 2010, the Compensation Committee granted themselves, and other non-employee directors, and the Company's executive officers their annual grant of stock options just prior to the release of favorable financial information. Through this method, the Compensation Committee effectively *engaged in insider-trading* whereby they were able to ensure that the option recipients received an option with an artificially enhanced value, on which the market price (and thus, the exercise price), was lower than it should have been, given the material inside information (of a favorable nature) known to the Company at the time of the grant and that was to be made public soon after the grant. Specifically, on Thursday, February 11, 2010, Kiani was

16

granted 300,000 options (again, 200,000 more than allowed under the Executive Officer Compensation Policy); non-employee directors Barker, Cahill, R. Coleman and Lasersohn were each granted 20,000 options; and executive officers de Raad, Fishel, and Lee were each granted 30,000 options. The exercise price of the stock options was $27.25 per share, the closing price of the Company's common stock on February 11, 2010. Then, two trading days later on Monday, February 16, 2010, the Company released its financial results for the fourth quarter and full year 2009, as well as its financial guidance for the 2010 year. The Company reported a strong fourth quarter. In particular, the press release stated:

> Masimo's fourth quarter product revenues rose 12% to $80.5 million, compared to $71.6 million for the fourth quarter of 2008.  Revenues from Masimo Rainbow SET products rose 23% to $5.8 million in the fourth quarter.  Including royalty revenues, Masimo's total revenues for the fourth quarter were $92.6 million, up 11% from $83.1 million for the fourth quarter of 2008.

> Net income for the fourth quarter was $14.1 million, or $0.23 per diluted share, compared to a net loss of approximately $530,000, or $0.01 per share in the same period last year, which included a $14.9 million, or $0.25 per share, tax charge related primarily to the prepayment of licensing rights to utilize pre-existing intangibles as part of the implementation of a new international business organization and structure.

The Company also reported strong full year results. In particular, the press release stated:

> For 2009, Masimo product revenues rose 16% to $300.1 million, compared to $259.6 million in 2008.  Revenues from Masimo Rainbow SET products rose 46% to $19.5 million in 2009.  Including royalty revenues, 2009 total revenues were $349.1 million, up 14% from $307.1 million in 2008.  Total 2009 direct and distribution revenues were $241.7 million, up 20% from $201.1 million in 2008 while OEM revenues were unchanged at $58.4 million.

> Masimo reported 2009 net income of $53.2 million, or $0.88 per diluted share, compared to $31.9 million, or $0.53 per diluted share in 2008, which included the $0.25 per share tax charge related to the prepayment of licensing rights to utilize pre-existing intangibles as part of the implementation of its new international business organization and structure. . . .
> As of January 2, 2010, cash, cash equivalents and short-term investments totaled $189.0 million, up 29% from $146.9 million at January 3, 2009.

Lastly, the Company also released financial guidance for the 2010 fiscal year, predicting substantial growth compared to 2009. Specifically, the press release stated:

> Masimo expects fiscal 2010 total revenues to be between $390 million and $405 million, including product revenues between $345 million and $360 million, and royalty revenues between $44 million and $46 million. The company expects fiscal 2010 earnings per share to be between $1.12 and $1.18, including approximately $0.15 from a one-time gain related to resolution of an anticompetitive legal matter with Covidien in the first quarter of 2010, offset by expected incremental one-time spending associated with this recovery. The company's guidance also includes an increase in 2010 non-cash stock-based compensation expense to $14.7 million from $10.7 million in 2009. The components of Masimo's guidance set forth above are estimates only and actual performance could differ.

By timing the stock options grant just prior to the release of these strong financial results, the Compensation Committee engaged in insider-trading and again, for the third straight year, violated the 2007 Plan.

### The 2011 Stock Option Grants

A.  *The February 2011 Stock Option Grant*

51.    The timing and amount of the stock options granted to the Defendants in 2011 was even more egregious. On February 22, 2011, the Compensation Committee made the annual grant of stock options to themselves and the other Defendants. Kiani was granted 300,000 options (200,000 more than allowed under the 2007 Plan); non-employee directors Barker, Cahill, R. Coleman and Lasersohn were each granted 20,000 options; executive officers de Raad, Fishel, Lee and Sampath were each granted 30,000 options; and executive officer J. Coleman was granted 25,000 options. The exercise price of the options was $30.06 per share, the closing price of the Company's common stock on that date

B.  *Masimo's Performance Following the February 2011 Grant*

52.    In the months immediately following the February 2011 Grant, Masimo's stock price steadily increased, closing as high as $34.83 per share on April 28, 2011.

53.     Thereafter, over the following months, Masimo stock began a steady decline. On May 31, 2011, Masimo stock closed at $30.72 per share.   On June 30, 2011, Masimo stock closed at $29.68 per share.   On July 29, 2011, Masimo stock closed at $27.78 per share. By August 31, 2011, Masimo stock closed at $24.67 per share. During the period ranging from August 8, 2011 through October 25, 2011 Masimo's stock had an average closing price of $22.98 per share.   On October 25, 2011, the Company's stock closed at $22.32 per share.

54.     On October 25, 2011, Masimo announced its financial results for its third quarter of 2011. The Company reported that its total revenues rose just 3% to to $104.0 million, compared to $101.0 million for 2010's third quarter.   The Company also reported net income for the quarter of $14.8 million, or $0.24 per diluted share, compared to net income of $16.4 million, or $0.27 per diluted share, in the third quarter of 2010.

55.     For the quarter, the Company failed to meet analyst expectations. As described in an October 25, 2011 article on *Reuters*:

> Oct 25 (Reuters) - Masimo Corp posted quarterly results below analysts' estimates on lower sales of its blood-monitoring device, and cut its full-year forecast, sending its shares down 5 percent after the bell.
>
> The maker of non-invasive patient monitoring products said quarterly sales of its Masimo SET pulse oximetry and Masimo rainbow SET Pulse CO-Oximetry units fell 11 percent, excluding hand-held units.
>
> For 2011 Masimo now expects a profit of $1.04-$1.06 per share, on revenue of $436-$439 million, against analysts' expectations of a profit of $1.16 per share before special items, on revenue of $449.5 million.
>
> The company had earlier forecast 2011 profit of $1.17-$1.25 per share on revenue of $446-$463 million.
>
> For the third quarter, the company's net income fell to $14.8 million or 24 cents a share, from $16.4 million, or 27 cents a share, a year ago. Revenue was up 3 percent at $104 million.

Analysts had expected a profit of 27 cents a share, on revenue of $109.7 million, according to Thomson Reuters I/B/E/S.

Shares of the Irvine, California-based company fell 5 percent to $21.29 in extended trading. They closed at $22.32 Tuesday on Nasdaq.

56.     In the October 25 press release, Masimo also announced that it had lowered its revenue and earnings guidance for the 2011 fiscal year. Masimo's 2011 revenue guidance was reduced from a range of $446-$463 million to a range of $436-$439 million, and earnings guidance was reduced from a range of $1.17-$1.25 per share to a range of $1.04-$1.06 per share.

57.     In addition, on October 26, 2011, investment bank William Blair downgraded Masimo from Outperform to Market Perform.

58.     Following the release of the financial results and the revised guidance, the Company's stock price declined 10.3% from $22.32 per share on October 25, 2011 to close at $20.02 per share on October 26, 2011.  The following day, the Company's shares closed at $20.19, on more than 8 times the average trading volume.

59.     The 10.3% one-day drop equated to the fourth largest single-day decline in the Company's history.  The $20.02 and $20.19 per share closing prices on October 26 and 27, respectively equated to near-historic lows for the Company.

60.      By the time the Company's stock closed at $20.19 per share on October 27, 2011, the stock options granted in February 2011 at an exercise price of $30.06 per share,  were significantly underwater with Masimo stock having decreased by 32.83% since the February 2011 grant. The likelihood that the option recipients would be able to realize significant value – or any value at all for matter – had been drastically reduced.

C.  *The October 2011 Grant*

61.     On October 27, 2011, the Compensation Committee approved a second "annual" round of stock options to themselves and the other Defendants at an exercise price of $20.19 per share, the closing price of Masimo common stock on October 27, 2011. Defendant Kiani was granted another 300,000 options; each of the Company's non-employee directors were granted another 20,000 options; and defendants de Raad, J. Coleman, Fishel, Lee, and Sampath were each granted another 30,000 options as follows:

| Name | February "Annual" 2011 Grant | October 2011 "Annual" Grant |
|------|------|------|
| Joe Kiani | 300,000 | 300,000 |
| Mark de Raad | 30,000 | 30,000 |
| Rick Fishel | 30,000 | 30,000 |
| Anand Sampath | 30,000 | 30,000 |
| Jon Coleman | 25,000 | 30,000 |
| Yongsam Lee | 30,000 | 30,000 |
| Stephen J. Barker | 20,000 | 20,000 |
| Edward L. Cahill | 20,000 | 20,000 |
| Robert Coleman | 20,000 | 20,000 |
| Jack Lasersohn | 20,000 | 20,000 |
| Sanford Fitch | ----- | 20,000 |

62.     The October 2011 grant violated the Director Compensation Policy of the Plan by causing non-employee directors Barker, Cahill, R. Coleman, and Lasersohn to each receive 40,000 stock options during the 2011 calendar year when only a grant of 20,000 was allowed.

63.     The October 2011 grants violated the Executive Compensation Policy of the Plan by causing Defendant Kiani to receive 600,000 stock options during the 2011 calendar year when only 100,000 was allowed.

64.     In addition, because executive officers Kiani, de Raad, Fishel, Sampath, J. Coleman and Lee each received a second round of stock options during 2011, the October 2011 Grant also violated the Executive Officer Compensation Policy which provided for an "annual grant" of stock options to be "granted at the first meeting held . . . by the [Compensation] Committee on or after the Chief Executive Officer's Eligibility Date."

65.     Moreover, with the value of the February 2011 Grant virtually worthless due to the 32.83% decrease in the Company's stock price during the prior 8 months, the October 2011 Grant virtually replaced the first grant, with each recipient receiving the same amount of options (other than J. Coleman, who received 5,000 more options in October, and Fitch who did not receive any options in February) they received in February.   Thus, in essence, the October 2011 Grant represented a repricing of the stock options granted in February 2011 from an exercise price of $30.09 per share to a lower exercise price of $20.19 per share.

66.     Accordingly, the October 2011 grant also violated the 2007 Plan, which expressly requires the Board to seek shareholder approval prior to a repricing.

67.     Last, by timing the grant immediately after the fourth largest one-day drop in the Company's history, the Compensation Committee was once again taking advantage of a sudden drop in the Company's stock price, likely due to an overreaction by the market following the disappointing financial results that had just been released. Indeed, the closing price of the Company's common stock on the five trading days following October 27, 2011 were $20.24, $20.68, $21.22, $20.90, and $21.46.   Accordingly, the Compensation Committee timed the

October 2011 grant at the most opportune time; a time when the Company's stock price was trading at a discount to its fair market value, thus defeating the express purpose of the 2007 Plan whose goal is to incentivize management to increase shareholder value.  By timing the grants when the stock was trading at artificially low prices due to temporary declines no such incentive was -- or could have been -- created.

### D. The Second October 2011 Grant Constitutes Excessive Compensation

68.    The October 2011 Grant resulted in excessive and unfair compensation to the Company's non-employee directors, when compared both to prior years and to the Company's peers.

69.    Non-employee directors Barker, Cahill, R. Coleman, and Lasersohn each received double the amount of stock options in fiscal 2011 (40,000 stock options) than in each of 2009 and 2010 (20,000 options each year).

70.    The following chart shows the value of the compensation[1] received by each of the Company's non-employee directors between 2009 and 2011.

| Defendant | 2009 Total Compensation | 2010 Total Compensation | 2011 Total Compensation |
|-----------|-------------------------|-------------------------|-------------------------|
| Barker | $234,894 | $218,918 | $397,812 |
| Cahill | $234,894 | $218,918 | $397,812 |
| Coleman | $234,894 | $218,918 | $397,812 |
| Fitch | $40,000 | $40,000 | $204,438 |
| Lasersohn | $234,894 | $218,918 | $397,812 |

71.    The compensation granted to non-employee directors is also excessive when compared to the Masimo's peers. The 2012 Proxy lists a peer group of 16 companies that had "annual revenues of $325 million and an average market capitalization of $1.2 billion, which the

---

[1] As described in the Company's proxy statements, the value of the stock options represents the aggregate grant date fair value of the options computed in accordance with authoritative accounting guidance.

Compensation Committee believed to be the appropriate benchmark in light of [Masimo's] size and [Masimo's] expected growth at that time."

72.     The following chart illustrates the average value of the compensation received by the non-employee directors in each peer company identified in the Proxy during their respective 2011 fiscal years.[2]   As set forth in the chart below, the average value of the compensation received by Masimo's non-employee directors was 29% more than even the second highest company in the list, and equated to more than double the average compensation received by all the peers.

| Peer-Group Company | Avg.     Director     2011 Compensation |
|---|---|
| **Masimo** | **$359,137** |
| Gen-Probe | $278,344 |
| Haemonetics Corp. | $248,795 |
| Myriad Genetics | $242,584 |
| Thoratec | $232,726 |
| Nuvasive | $206,351 |
| Sonosite | $191,659 |
| ArthroCare | $179,286 |
| Volcano | $170,785 |
| Natus Medical | $168,261 |
| AngioDynamics | $157,963 |
| Quidel | $151,378 |
| Zoll | $127,749 |
| Merit Medical | $121,948 |
| ICU Medical | $102,803 |
| Meridian Bioscience | $95,906 |
| Abaxis | $79,479 |
| **Overall Peer-Group Avg.** | **$172,251** |

---

[2] The amounts were taken from the non-employee director compensation table in each company's respective proxy statement. With respect to Sonosite, amounts were taken from its fiscal 2010 year as more recent data is not available.  The companies listed in the chart are hereinafter referred to as the "Peer Group."

73.     The October 2011 Grant also resulted in excessive and unfair compensation to the Company's executive officers, both when compared to prior years and when compared to the Peer Group.

74.     The following chart is the Summary Compensation Table taken from the 2012 Proxy.  In total, as a result largely due to the October 2011 Grant, executive officers Kiani, de Raad, J. Coleman, Fishel, and Lee saw an increase in their total 2011 compensation of 49.82%, 5.84%, 72.56%, 5.73% and 6.37%, respectively when compared to the 2010 fiscal year:

| Name and Principal Position(s) | Year | Salary | Bonus | Option Awards[1] | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| Joe Kiani | 2011 | $717,679 | $356,050[2] | $5,967,180 | $    607,774[3] | $7,648,683 |
| | 2010 | 708,412 | 834,794[4] | 3,283,770 | 278,386[5] | 5,105,362 |
| | 2009 | 688,647 | 195,624[2] | 3,523,410 | 21,831[6] | 4,429,512 |
| Mark P. de Raad | 2011 | 320,008 | 75,940[7] | 596,718 | 20,724[8] | 1,013,390 |
| | 2010 | 317,176 | 291,829[9] | 328,377 | 20,103[10] | 957,485 |
| | 2009 | 307,456 | 69,782[2] | 352,341 | 22,021[11] | 751,600 |
| Jon Coleman | 2011 | 319,951 | 68,661[12] | 538,375 | 20,724[13] | 947,711 |
| | 2010 | 298,863 | 230,251[14] | — | 20,103[15] | 549,217 |
| | 2009 | 270,964 | 61,529[2] | 531,020 | 21,831[16] | 885,344 |
| Rick Fishel | 2011 | 322,031 | 75,178[17] | 596,718 | 18,638[18] | 1,012,565 |
| | 2010 | 318,160 | 292,900[19] | 328,377 | 18,225[20] | 957,662 |
| | 2009 | 308,607 | 70,038[2] | 352,341 | 23,897[21] | 754,883 |
| Yongsam Lee | 2011 | 315,035 | 73,931[22] | 596,718 | 20,724[23] | 1,006,408 |
| | 2010 | 314,509 | 283,153[24] | 328,377 | 20,103[25] | 946,142 |
| | 2009 | 307,955 | 69,371[2] | 352,341 | 21,831[26] | 751,498 |

75.     The Company's executive officers received increases in compensation despite the fact that the Company performed poorly in 2011. Specifically:

- Masimo's stock declined by 36.34% during 2011.

- Masimo's net income for 2011 declined by 13.3% from $73.5 million to $63.7 million as compared to 2010.

- Masimo's total revenue for 2011 was $439.0 million, not even hitting the low end of its original revenue guidance of $446-$463 million.

- Masimo reported GAAP earnings of $1.05 per diluted share, not even hitting the low end of its original guidance of $1.17-$1.25 per share.

76.    The following chart illustrates the 2011 compensation received by the CEO in each peer company.[3] As can be seen from the following chart, the compensation received by Masimo's CEO was 24.4% more than even the second highest company in the list, and equated to more than 2.67 times the average compensation received by all the CEOs in the Peer Group:

| Peer Group Company | CEO Compensation |
|---|---|
| **Masimo** | **$7,648,683** |
| Nuvasive | $6,148,370 |
| Myriad Genetics | $4,866,584 |
| Gen-Probe | $4,726,339 |
| Thoratec | $4,474,166 |
| ICU Medical | $3,639,243 |
| Volcano | $3,213,446 |
| Haeomonetics Corp | $3,072,139 |
| Abaxis | $2,286,596 |
| Zoll | $2,256,190 |
| ArthroCare Corp | $2,102,531 |
| Merit Medical | $2,074,951 |
| Natus Medical | $1,857,526 |
| Quidel | $1,752,307 |
| AngioDynamics | $1,260,466 |
| Sonosite | $1,171,394 |
| Meridan Bioscience | $843,411 |
| **Average** | **$2,859,104** |

---

[3] The amounts were taken from the Summary Compensation Table in each company's respective proxy statement. With respect to Sonosite, amounts were taken from its fiscal 2010 year as more recent data is not available.

77.     The incongruity between Masimo's performance and compensation has also been noted by Institutional Shareholder Service, Inc. (ISS), which provides proxy statement analysis to institutional shareholders.  In a May 25, 2012 report (the "ISS Report"), ISS Proxy Advisory Services criticized Masimo's executive compensation program, identifying a "high concern with respect to the alignment of CEO pay and company performance at this time."  As described in the ISS Report, "CEO pay has significantly outranked the company's TSR performance on a one- and three-year basis, while the CEO's pay magnitude is 3.41 times the ISS selected peer median."  Moreover, the ISS Report stated:

> The CEO's total compensation has increased by 45.6 percent while the company's shareholder returns have declined with the company registering negative returns for the year under review. This increase has primarily been triggered by a large time-based equity grant awarded to the CEO. Last year, ISS recommended that shareholders vote against the company's say-on-pay proposal because of a pay-for-performance disconnect. See the Compensation Committee Communication & Responsiveness section for last year's vote result and the company's response. As such, this is the second consecutive year in which pay for performance misalignment issues have been identified.
>
> The company maintains an annual cash bonus program that awards its executives based on the achievements of pre-determined performance metrics. The company does not disclose the weight afforded to each performance metric, stating that it targets three separate performance objectives in EPS, gross revenues and individual factors. If the separate targets are achieved, the CEO is eligible to receive a bonus of 50 percent of his annual base salary. The company was unable to achieve the targeted performance metrics; however, the company substituted the target bonus percentage of 50 percent of annual base salary and replaced it with the "maximum bonus percentage." The maximum bonus percentage sets the CEO's target cash bonus award at 97.8 percent of his annual base salary, and the compensation committee has the sole discretion to invoke this right. Despite the company's lack of achievement for the targeted metrics, the CEO received $318,146 in cash bonus, or 50 percent of his base salary.
>
> In addition to the annual incentive award, the company also granted its executives, including CEO Kiani, two sets of time-based equity awards, which ISS has valued at approximately $8.5 million. Although the company has stated that in recognition of last year's low say-on-pay vote result it will not grant any

equity in FY 2012, the 2011 grant, even if broken down over two years, still amounts to over $4.25 million in stock options alone, leaving the CEO's total pay at almost two times the ISS selected peer median. Furthermore, the company has not disclosed its reasoning to grant two sets of equity awards during the year, both consisting of 300,000 stock options. However, considering the sudden decrease in the company's share price (and exercise price) between the first grant on Feb. 22, 2011 at $30.06, and the second grant on Oct. 27, 2011 at $20.19, it appears that the decrease in the share price may have prompted the company to award stock options at what is the company's lowest share price since Aug. 16, 2007. And while the company states the size of its equity grants are subjective and determined based on what is appropriate to incentivize executives, the company has for the past three years granted the CEO 300,000 stock options. Shareholders prefer companies to grant performance-based equity as it acts as a tool to further align executive pay with company performance. It should also be noted that the company suffers from internal pay discrepancies with CEO pay being eight times larger than the second highest paid NEO. Such significant discrepancy may complicate succession planning.

For the second consecutive year, a persistent pay for performance misalignment has been identified. In addition to having discretionarily increased the CEO's target bonus award, the company also granted a disproportionate amount of time-based equity considering the company's deteriorating shareholder returns.

78.     The following graph from the ISS Report illustrates defendant Kiani's excessive

compensation.  The chart compares pay (x-axis) and performance (y-axis).



Relative Alignment – Weighted Average of 1- & 3-yr rankings

The chart plots pay for the company (▲) and its peers (◆). The gray bar represents the
area where pay and performance demonstrate alignment.

Defendant Kiani is marked by the triangle located at the bottom-right corner.  Defendant Kiani is

thus one of the most highly-compensated and lowest-performing CEOs in the peer group

selected by ISS.  As the caption states, "[the] gray bar represents the area where pay and

performance demonstrate alignment."

79.     The following graph, also taken from the ISS Report, shows the relationship

between Kiani's pay and the Company's total stockholder return over the past 5 years.  In large

part due to the October 2011 Grant, the graph shows the huge misalignment between 2011

compensation and total stockholder return:



## Absolute Alignment – 5-year Pay vs. TSR

|  | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Pay($000) | 3,745 | 7,333 | 5,613 | 6,994 | 10,184 |
| Indexed TSR | 100.00 | 75.61 | 77.11 | 81.28 | 52.25 |
| CEO | Kiani | Kiani | Kiani | Kiani | Kiani |

Indexed TSR represents the cumulative total return of the company's stock for a five-year fiscal period based on a $100 investment at the start of the first year, and reinvestment of all dividends. The table shows the value of the investment at the end of each year.

80.     Last, even a majority of the Company's shareholders have expressed their disapproval of the Company's 2011 executive compensation. Section 951 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") requires that companies include a resolution in their proxy statements asking shareholders to approve, in an advisory vote, the compensation of executive officers, as disclosed under Item 402 of Regulation S-K (a "say-on-pay" vote).   A say-on-pay vote is intended to "serve as a direct referendum on the

decisions of the compensation committee" and allow shareholders and board members "to stand up to excessively demanding officers or compensation consultants."

81.     As of about July 18, 2012, of the approximately 1,907 companies in the Russell 3000 that have had a say-on-pay vote in 2012, only 51 (or approximately 2.67%) have failed to receive shareholder support for their executive compensation.

82.     In the 2012 Proxy, the Board recommended that the shareholders vote "for" approval of the 2011 executive compensation. At the Company's 2012 Annual Meeting held on June 7, 2012, despite the Board's recommendation, Masimo's shareholders rejected the Company's 2011 executive compensation, with approximately 62.34% of voting shareholders voting against Masimo's executive compensation at the say-on-pay vote.

### *False and Misleading Statements Concerning  Masimo's Stock Option Granting Practices*

83.     Between 2009 and 2012, the Board issued proxy statements that contained materially false and misleading information regarding the stock option granting practices of the Company (see proxy statements filed by the Company with the SEC on April 20, 2009, April 22, 2010, April 27, 2011, and April 27, 2012, collectively the "Proxy Statements").

84.     First, the Proxy Statements failed to disclose how the Compensation Committee chose the dates to grant the 2008-2011 stock options. Indeed,  Item 402 of Regulation S-K ("Item 402") of the Securities Exchange Act of 1934 (the "Exchange Act") states that examples of "material information" required to be disclosed in a proxy statement "may include, in a given case, among other things. . . How the determination is made as to when awards are granted, including awards of equity-based compensation such as options." Given that the Compensation Committee did not grant stock options pursuant to any regularly scheduled, predetermined dates,

and given the opportunistic timing of the grants discussed herein, how the Compensation Committee determined the grant dates is material information that should have been disclosed.

85.     Furthermore, each of Proxy Statements represents: "Our Compensation Committee reviews its grant date practices for stock options to assure that our grant practices are aligned with what it believes constitute best practice guidelines." However, "best practices" in option granting includes granting options on  regularly scheduled, pre-determined dates; a practice the Compensation Committee has contravened each year since its IPO. For example, as stated in a 2007 Woodruff Sawyer & Company article entitled *Option Granting Best Practices: Avoiding the Sins of the Past*:

> All options-whether for new hires or for current employees should be granted on regularly scheduled, pre-determined dates, except under extraordinary circumstances. In such unusual situations, option grants should be postponed at least until the next regularly scheduled date. When options are consistently granted on pre-determined dates that are determined well in advance, option-granting manipulation is much more difficult, and hence the risk of accusations and investigations is greatly reduced.

Additionally, according to a July 2008 article by Blank Rome LLP titled *Understanding the Option Dating Controversies—Part IV: Best Practices*, best practices include:

> *Establish a fixed schedule of meetings at which options will be granted.* The meetings should be scheduled at regular intervals in advance, and, to lessen the likelihood of having material non-public information, each meeting should take place well inside a "window period." This usually begins at least 48 and perhaps as much as 72 hours after the dissemination of material non-public information, such as an earnings release. As an additional safety measure, consider scheduling meetings to begin after the market closes so that the most recently available trading price of the stock (and, therefore, the strike price of the option) is known and fixed.
> *Disclose all material non-public information to the board or committee prior to approving options.* Holding a pre-scheduled meeting during a "window period" of course does not prevent board or committee members from considering grants at a time where officers or directors may be in possession of material non-public information. In the wake of Delaware case law interpreting option-related conduct, the most troubling aspect of spring loading for directors is a potential state law breach of fiduciary duty claim. To be safe, best practices would suggest

that a board or committee not grant an option at a time when it knows of material non-public information.

Therefore, due to the Company's failure to grant options at regularly scheduled, predetermined dates, and given their propensity for granting options at the most opportune times, the Company's assertions that it adheres to "best practices" in this area are false and misleading.

86.     In addition, in each of the Proxy Statements, the Company has represented that all stock options were granted with an exercise price equal to the fair market value of the Company's common stock on the date of the grant. In particular, each of the Proxy Statements stated:

> Since our initial public offering, all stock options were granted with an exercise price equal to the "fair market value" of a share of our common stock on the grant date, which the Compensation Committee has set as the closing price of our common stock, as reported on Nasdaq, on the grant date. All equity awards to our employees, including executive officers and to directors, have been granted and reflected in our consolidated financial statements, based upon the applicable accounting guidance, with the exercise price equal to the fair market value on the grant date based on the valuation determined by our Compensation Committee.

This statement is misleading in conveying the impression that the Compensation Committee was granting stock options in a manner consistent with the purposes and objectives of the 2007 Plan, and in failing to disclose the opportunistic timing of the stock option grants.

87.     The Proxy Statements also included false statements concerning the limits imposed on Kiani in the Executive Officer Compensation Policy. In particular, each Proxy Statement represented that the Executive Officer Compensation Policy entitled Kiani to 300,000 stock options each year, when the terms of the Executive Officer Compensation Policy, as displayed above, entitled Kiani to only 100,000 options.   As stated in each of the Proxy Statements:

> In May 2007, our Board adopted our Equity Award Compensation Policy, which was most recently amended effective January 4, 2008. Under the Equity Award

Compensation Policy, our Chief Executive Officer and other executive officers designated by our Compensation Committee *are eligible to receive an annual non-qualified stock option grant*. Generally an executive officer is first eligible to receive an annual grant once the executive first becomes vested as to at least 60% of the first option grant the executive receives from us. ***Once eligible, our Chief Executive Officer will receive an annual option grant to purchase an aggregate of 300,000 shares of common stock and our other executive officers may receive an annual option grant to purchase the number of shares of common stock approved by our Compensation Committee at the time of grant.*** The specific amount of the stock option for each named executive officer other than our Chief Executive Officer is based on a subjective assessment by the Compensation Committee of the extent to which the stock options will further our company's goals of retaining executives and motivating the executives to achieve strong long-term performance. In connection with this determination, the Compensation Committee also takes prior year grant levels and individual roles and responsibilities when determining the specific amount of the option award values to be awarded to each of the other named executive officers. All options granted under the Equity Award Compensation Policy will have an exercise price equal to the fair market value of our common stock on the date of grant and vest at a rate of 20% per year over five years. Messrs. Kiani, de Raad, Fishel, and Lee received a stock option grant pursuant to the policy in January 2009, February 2010, and February 2011. Messrs. Kiani, de Raad, Coleman, Fishel, and Lee received a stock option grant pursuant to the policy in February 2011. See "—Components of our Compensation Approach—Equity Based Incentives" above.

[Emphasis Added].

Thus, not only did the Board violate the terms of the Executive Officer Compensation Policy by granting Kiani at least 300,000 stock options each year, but it also deceptively conveyed the impression in the Proxy Statements that the policy permitted the 300,000 yearly award.

88.     The false or misleading misstatements and/or omissions discussed above were material information when it came to the Masimo's shareholders' decisions on whether to reelect the current Board members each year, and thus constitutes a breach of the Defendants' fiduciary duty of candor.

89.     As a result of the Defendants' actions, Defendants Cahill and R. Coleman were re-elected to the Board in 2009 and again in 2012, Defendants Kiani and Lasersohn were re-elected to the Board in 2010, and Defendants Barker and Fitch were re-elected to the Board in

2011. Without their re-election, the option granting practices challenged in this action could not have taken place.

## DEMAND FUTILITY ALLEGATIONS

90.     Pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, Plaintiff brings this action derivatively on behalf of Masimo to redress injuries suffered, and yet to be suffered, by the Company as a direct and proximate result of Defendants' misconduct. Plaintiff is a shareholder of Masimo and will adequately represent the interests of the Company in this litigation.

91.     At the time of this filing, the Masimo Board consists of six members, defendants Kiani, Barker, Cahill, R. Coleman, Lasersohn, and Fitch. Each of these Board members has been named as a Defendant in this action and has been a Board member since the Company's IPO.

92.     Plaintiff did not make a demand on the Masimo Board prior to instituting this action. A pre-suit demand upon the Board is a useless and futile action, and therefore excused, for several reasons.

93.     First, there is a reasonable doubt as to whether a majority of Masimo's Board is disinterested. Each of the Board members, other than Fitch, has received some of the challenged option grants in each year from 2009 to 2011. Even Fitch received some of the challenged option grants through his receipt of the October 2011 stock options at an artificially low exercise price. Thus, each Board member has a strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue his current holdings or cause himself to disgorge improperly obtained stock options. This creates an unacceptable conflict that restricts those Board members from evaluating this action independently. Accordingly, demand against the Board is excused.

94.     Board members Barker, R. Coleman and Lasersohn, who encompass half the Board, have served on the Compensation Committee since the Company's IPO. Each of these directors authorized, approved, and granted himself and the other Defendants stock options in violation of the Company's policies and in violation of the 2007 Plan, actions which were then masked in the yearly Proxy Statements. These actions, as discussed in more detail above, could not have been a valid exercise of business judgment.  In addition, as a result of these actions, defendants Barker, R. Coleman, and Lasersohn face a substantial likelihood of liability. Thus, Barker, Coleman, and Lasersohn are incapable of objectively considering a demand here.

95.     Defendants Kiani, Cahill, and Fitch served on the Company's Board since the IPO.  Kiani, Cahill, and Fitch each received some of the challenged option grants. As members of the Board, and pursuant to the terms of the 2007 Plan, Kiani, Cahill, and Fitch each had the power to act in lieu of the Compensation Committee on any matter pertaining to the 2007 Plan. Despite their power, Kiani, Cahill, and Fitch allowed the Compensation Committee to violate the policies adopted by the Board and the 2007 Plan when granting the challenged stock option grants discussed herein.  Accordingly, defendants Kiani, Cahill, and Fitch each face a substantial likelihood of liability and are incapable of objectively considering a demand here.

96.    The following chart summarizes the conflicts that demonstrate that 100% of the current Board is disabled from considering a demand due to their participation in the stock option grants:

| Current Director | Received February 2008 Stock Options | Received January 2009 Stock Options | Received February 2010 Stock Options | Received October 2011 Stock Options | Board Member at Time of Challenged Stock Option Grants (2008-2011) | Authorized Challenged Stock Option Grant as Member of Compensation Committee |
|---|---|---|---|---|---|---|
| Kiani | X | X | X | X | X | |
| Barker | | X | X | X | X | X |
| Cahill | | X | X | X | X | |
| Coleman | | X | X | X | X | X |
| Fitch | | | | X | X | |
| Lasersohn | | X | X | X | X | X |

97.    Moreover, defendant Kiani is incapable of independently considering a demand to commence and vigorously prosecute this action due to his present employment by the Company as its CEO, pursuant to which he receives substantial compensation. According to the Company's 2012 Proxy, Kiani is not "independent."

98.    Plaintiff has not made a demand on the shareholders of Masimo to institute this action because such demand would be a futile and useless act for at least the following reasons: (a) Masimo is a publicly held company with approximately 57.12 million shares outstanding, and presumably thousands of shareholders; (b) making demand on such a large number of shareholders would be impossible for Plaintiff, who has no way of learning the names, addresses or phone numbers of all the Company's shareholders; and (c) making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I
### Breach of Fiduciary Duty
### (Against All Defendants)

99.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

100.    As officers and/or directors of the Company, each of the Defendants owed the Company and its shareholders the fiduciary obligations of loyalty, good faith, and due care. The Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

101.    In approving (or by abdication of duty permitting and/or accepting) the challenged stock option grants discussed herein, the Director Defendants breached their fiduciary duties of loyalty and good faith.  These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests, but rather lined the pockets of the Defendants at the expense of the Company and its shareholders.

102.    In addition, the Officer Defendants knew or, absent recklessness, should have known that the challenged grants discussed herein violated the 2007 Plan and the Executive Officer Compensation Policy. Each of the Officer Defendants would have noticed the unusual and opportunistic timing of each of the stock option grants from 2008 to 2010.  Moreover, each of the Officer Defendants was subject to the Executive Officer Compensation Policy and, since the policy's adoption, was accustomed to receiving an annual stock option grant during the first fiscal quarter of each year. The Officer Defendants would have noticed the unusualness of the second "annual" grant, including its suspicious timing immediately following the October 25, 2011 earnings announcement and stock price drop.  Yet, the Officer Defendants nonetheless

accepted the challenged stock option grants for their own personal benefit to the detriment and expense of the Company. Accordingly, the Officer Defendants breached their fiduciary duty of loyalty and good faith.

103.    Moreover, since the Compensation Committee Defendants, Kiani and Cahill (and with respect to the October 2011 grants, Fitch), stood on both sides of the challenged stock option grants, the grant will be subject to the entire fairness standard of review.

104.    The challenged stock option grants discussed herein does not satisfy the entire fairness criteria. As described above, the challenged stock option grants were the product of unfair dealing initiated and consummated by self-interested Board members. The timing, structure, and disclosure of the challenged stock option grants were unfair. In addition, the price of the grants was unfair as it resulted in artificially low exercise prices and excessive compensation described in more detail above.

105.    As a direct and proximate result of the Defendants' failure to perform their fiduciary obligations Masimo has sustained and will continue to sustain significant damages as a result of excessive and unwarranted stock option grants made to the Defendants.

106.    Defendants' misconduct has caused, and will continue to cause, substantial injury to Masimo, including, *inter alia:* (a) issuance of stock options that were unwarranted, or at the very least, issued at artificially low exercise prices; (b) dilution and compensation expenses as a result of the issuance and potential exercise of the challenged stock option grants; and (c) indirect expenses such as reputational injury and lost productivity as the Company will be forced to focus management efforts on addressing the misconduct described herein. Indeed, evidence of reputational injury can already be seen through the failed say-on-pay vote, and the Company will now have to spend significant time and resources addressing shareholder concerns.

107.   As a result of the misconduct alleged herein, the Defendants are liable to the Company.

108.   Plaintiff has no adequate remedy at law.

## COUNT II
### Unjust Enrichment
### (Against All Defendants)

109.   Plaintiff repeats and realleges each and every allegation set forth above as if set forth fully herein.

110.   The Defendants have received and will receive excessive and unwarranted personal financial benefits as a result of the challenged stock option grants discussed herein.

111.   As alleged herein, the challenged stock option grants were granted in violation of the Company's policies and the 2007 Plan and resulted in excessive and unfair compensation. It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for the Defendants to retain the benefits of option awards that were granted in violation of the Company's policies and the 2007 Plan.

112.   The Defendants have been unjustly enriched at the expense of and to the detriment of Masimo.

113.   Accordingly, this Court should order the Defendants to disgorge all profits and benefits obtained by the Defendants, and each of them, from their wrongful conduct and fiduciary breaches described herein and should order the stock options held by the Defendants to be rescinded or repriced.

114.   Plaintiff has no adequate remedy at law.

## COUNT IV
### Breach of Fiduciary Duty As a Result of Misstatements
### (Against the Director Defendants)

115.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

116.    Each of the Director Defendants had a fiduciary duty of candor, a duty to insure full and fair disclosure of all material information provided to Masimo's shareholders, including without limitation when seeking shareholder action.

117.    All of the Director Defendants caused Masimo to issue the 2009-2012 Proxy Statements.

118.    As alleged above, each of the Proxy Statements contained materially false or misleading information and/or omissions relating to the improper option granting practices discussed herein, and constituting a breach of the Director Defendants' fiduciary duty of candor.

119.    As a result of the Director Defendants' actions, Defendants Cahill and R. Coleman were re-elected to the Board in 2009 and again in 2012, Defendants Kiani and Lasersohn were re-elected to the Board in 2010, and Defendants Barker and Fitch were re-elected to the Board in 2011. Without their re-election, the option granting practices challenged in this action could not have taken place.

120.    As a result of these actions, the Company has been and will be damaged.

121.    The Director Defendants are liable to Masimo as a result of this misconduct and breaches of duty alleged herein.

122.    Plaintiff has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.     Rescinding and/or repricing the improperly issued stock options granted to the Defendants;

B.     A declaration that the Proxy Statements are materially false and misleading;

C.     Against Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, and violation of the 2007 Plan and the Company's policies, plus pre-judgment and post-judgment interest;

D.     Against Defendants and in favor of the Company for the amount of their unjust enrichment;

E.     Equitable and/or injunctive relief as necessary or permitted by law and equity, including disgorgement, attachment, impoundment, and/or imposition of a constructive trust on or otherwise restricting the disposition/exercise of the challenged option grants discussed herein;

F.     Directing Masimo to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and policies and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

G.     Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiff's attorneys, experts, and accountants; and

H.     Granting Plaintiff such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:   September 19, 2012                          FARNAN LLP

                                                    /s/ Brian E. Farnan
                                                    Brian E. Farnan (Bar No. 4089)
                                                    Michael J. Farnan (Bar No. 5165)
                                                    919 N. Market Street, 12th Floor
                                                    Wilmington, Delaware 19801
                                                    Tel: (302) 777-0300
                                                    Fax: (302) 777-0301
                                                    bfarnan@farnanlaw.com

*Of Counsel:*

Eduard Korsinsky, Esq
Levi & Korsinsky, LLP.
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171