## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

JOSEPH P. AUSIKAITIS, derivatively )
on behalf of MASIMO CORPORATION, )
)
      Plaintiff, )
)
v. )    Civ. No. 12-1175-SLR
)
JOE KIANI, et al., )
)
      Defendants, )
)
    and )
)
MASIMO CORPORATION, a Delaware )
Corporation, )
)
      Nominal Defendant. )

---

Brian E. Farnan, Esquire, and Michael J. Farnan, Esquire of Farnan LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Eduard Korsinsky, Esquire, and Steven J. Purcell, Esquire of Levi & Korsinsky LLP.

James L. Holzman, Esquire, and J. Clayton Athey, Esquire of Prickett, Jones & Elliott, P.A., Wilmington, Delaware. Counsel for Defendants. Of Counsel: William F. Sullivan, Esquire, and Peter M. Stone, Esquire of Paul Hastings LLP.

---

### MEMORANDUM OPINION

Dated: July 16, 2013
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Shareholder Joseph P. Ausikaitis ("plaintiff") filed the instant suit on September 19, 2012 against eleven individuals ("defendants") who are executive officers ("officers") and/or members of the board of directors (the "Board") of Masimo Corporation ("Masimo"). Masimo is named as nominal defendant. Plaintiff brings derivative claims against defendants for alleged violations of various shareholder-approved plans governing the grant of stock options to Masimo's officers and directors. (D.I. 1) Specifically, plaintiff alleges that, from 2008 to 2011, Masimo's directors improperly timed stock option grants to themselves and certain officers, either immediately before the release of positive information or immediately after a large and sudden drop in Masimo's stock price. The Board also allegedly awarded more stock options than permitted by shareholder-approved plans; improperly repriced stock options; granted excess and unfair compensation; and made false and misleading statements or omissions regarding its practices. Plaintiff's complaint brings claims for breaches of fiduciary duty and for unjust enrichment. (Id. at ¶¶ 99-122)

Currently before the court is a motion to dismiss filed by defendants pursuant to Federal Rules of Civil Procedure 12(b)(6) and 23.1. (D.I. 9) The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

## II. BACKGROUND

### A. The Parties

Plaintiff is a citizen of Massachusetts. (D.I. 1 at ¶ 14) He avers that he has been a Masimo shareholder continuously since November 2007. (Id. at ¶ 17)

Masimo is a medical technology company organized under the laws of Delaware and with its principal place of business in Irvine, California. (*Id.* at ¶¶ 18, 32) Its Board is composed of six members, all of whom are named as defendants: Steven J. Barker, Edward L. Cahill, Robert Coleman ("R. Coleman"), Jack Lasersohn, Sanford Fitch, and Joe Kiani (collectively, "the directors" and, without Kiani, "the non-employee directors"). (*Id.* at ¶¶ 20-24) Kiani also serves as Masimo's chief executive officer ("CEO") and chairman of the Board. (*Id.* at ¶ 19) Also named as defendants are five of Masimo's officers: Jon Coleman ("J. Coleman"), Mark P. de Raad, Rick Fishel, Yongsam Lee, and Anand Sampath (collectively, "the defendant officers"). (*Id.* at ¶¶ 26-30) No defendant is a citizen of Massachusetts. (*Id.* at ¶¶ 14, 18-30)

## B. Masimo's Stock Option Policies

Masimo is publicly traded on the NASDAQ, and its initial public offering ("IPO") took place on August 7, 2007. (*Id.* at ¶ 32) All of the stock option grants being challenged in this action were issued under Masimo's 2007 Stock Incentive Plan (the "SIP"). (*Id.* at ¶ 34) To implement the SIP, the Board adopted a number of compensation plans, including the CEO and Executive Officer Equity Award Compensation Policy (the "OCP") and the Non-Employee Director Compensation Policy (the "DCP") (collectively, with the SIP, the "Compensation Plans"). (*Id.* at ¶ 39) The following is a summary of the basic terms of the Compensation Plans.[1]

### 1. The SIP

The SIP is governed by the laws of Delaware and permits the grant of stock

---

[1]The court takes judicial notice of the Compensation Plans, as they are explicitly relied upon in plaintiff's complaint.

options and other stock-based awards to Masimo's officers, directors, and employees.

(*Id.* at ¶ 34; D.I. 10, ex. A at § 21)  It was adopted by the Board in November 2006,

approved by Masimo's shareholders in June 2007, and became effective on August 7,

2007, in connection with Masimo's IPO.[2]  (D.I. 1 at ¶ 33; D.I. 10, ex. A at § 20, ex. D at

50)  The SIP is administered by the Board's compensation committee ("the

Committee"), but its terms provided that the Board may act in lieu of the Committee on

any matter.  (D.I. 1 at ¶ 35; D.I. 10, ex. A at § 4(a), ex. D at 50)[3]  The Committee is

composed of three directors – Barker, R. Coleman, and Lasersohn – who have served

on the Committee since Masimo's IPO.  (D.I. 1 at ¶¶ 20, 22-23, 25)

The SIP limits the number of stock options that can be granted annually to any

individual officer or director to 1,000,000 shares.  (D.I. 10, ex. A at § 5(c))  This limit is

subject to adjustments for, inter alia,

> any increase or decrease in the number of issued Shares resulting from a
> stock split, reverse stock split, stock dividend, combination,
> recapitalization or reclassification of the Shares, or any other increase or
> decrease in the number of issued Shares effected without receipt of
> consideration by the Company, in each case effected at any time after this
> Plan is approved by the Board (even though prior to the IPO Date).

(*Id.*, ex. A at §§ 5(c), 13(a))

The SIP also requires that the exercise price for stock options reflect "fair market

value" of Masimo common stock on the date of the grant:

---

[2]The SIP will terminate on August 7, 2017, unless the Board terminates it earlier.
(D.I. 10, ex. D at 50)

[3]The court may consider Masimo's proxy statements filed between 2009 and
2012 to establish what was disclosed (but not the truth of the disclosures, which the
parties dispute) because they are publicly available and explicitly relied on in plaintiff's
complaint.  (*See, e.g.*, D.I. 1 at ¶¶ 35, 83)

3

(d) Exercise Price. The exercise price of an Option shall be determined by the Committee in its sole discretion and shall be set forth in the Award Agreement, provided that:

> (i) if an [incentive share option] is granted to an Employee who on the Grant Date is a Ten Percent Holder, the per Share exercise price shall not be less than 110% of the Fair Market Value per Share on the Grant Date; and

> (ii) for all other Options, such per Share exercise price shall not be less than 100% of the Fair Market Value per Share on the Grant Date.

(*Id.*, ex. A at § 6(d)) "Fair market value" is defined in the SIP to mean the closing price of common stock on the grant date or, if no shares were traded on the grant date, then on the last preceding trading day during which a sale occurred. (D.I. 1 at ¶ 37; D.I. 10, ex. A at app. A) The SIP prohibits the repricing of stock options, "within the meaning of the federal securities laws applicable to proxy statement disclosure," without stockholder approval. (*See* D.I. 1 at ¶ 38; D.I. 10, ex. A at § 6(d))

### 2. The DCP

Pursuant to the SIP, the Board adopted the DCP, which was amended effective December 15, 2008. (D.I. 1 at ¶ 40; D.I. 10, ex. D at 61) As the 2012 proxy statement explained, "[u]pon first becoming a member of [Masimo's] Board . . . , unless otherwise determined by [the] Committee, each non-employee director other than [the] Audit Committee chairperson [, who receives an option grant for 150,000 shares,] receives an option to purchase 50,000 to 100,000 shares of [Masimo's] common stock that vests at a rate of 20% per year . . . ." (D.I. 1 at ¶ 40; D.I. 10, ex. D at 61) Upon vesting of 60% of this initial option award, the DCP also allows the Committee to award a non-employee director an annual option grant to purchase 20,000 shares of Masimo's

4

common stock that vest at a rate of 20% per year on each anniversary of the grant date. (D.I. 1 at ¶ 40; D.I. 10, ex. D at 61)

### 3. The OCP

On May 2007, the Board also adopted the OCP, which was amended effective January 4, 2008. (D.I. 1 at ¶ 41; D.I. 10, ex. D at 54) It provides that Masimo's CEO can receive an annual stock option grant for "an aggregate of 100,000 shares" and that other selected officers may receive an annual stock option grant in an amount determined by the Committee. (D.I. 1 at ¶¶ 42-43) Consistent with the SIP, the options vest at a rate of 20% per year and have an exercise price equal to 100% of the fair market value. (Id. at ¶ 43)

### C. The Challenged Stock Option Grants

Plaintiff challenges stock options that were granted by the directors to themselves and the defendant officers in each year between 2008 and 2011 ("the challenged grants"). (Id. at ¶ 45) As described below, the Committee allegedly violated the Compensation Plans by waiting to make the challenged grants at opportunistic times and, in certain instances, by exceeding the number of stock options permitted. Plaintiff also asserts that the Board made false and misleading statements in connection with the challenged grants and that options that were granted in October 2011 constituted excessive and unfair compensation. The timing and number of stock options awarded in the challenged grants are summarized as follows:

5

| Recipient (Position) | Grant Date (Exercise Price Per Share) | | | | |
|---|---|---|---|---|---|
| | 2/7/2008 ($30.79) | 1/9/2009 ($23.98) | 2/11/2010 ($27.25) | 2/22/2011 ($30.06) | 10/27/2011 ($20.19) |
| Kiani (CEO/Chairman) | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 |
| Barker (Director) | - | 20,000 | 20,000 | 20,000 | 20,000 |
| Cahill (Director) | - | 20,000 | 20,000 | 20,000 | 20,000 |
| R. Coleman (Director) | - | 20,000 | 20,000 | 20,000 | 20,000 |
| Lasersohn (Director) | - | 20,000 | 20,000 | 20,000 | 20,000 |
| Fitch (Director) | - | - | - | - | 20,000 |
| Lee (Officer) | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| de Raad (Officer) | - | 30,000 | 30,000 | 30,000 | 30,000 |
| Fishel (Officer) | - | 30,000 | 30,000 | 30,000 | 30,000 |
| Sampath (Officer) | - | - | - | 30,000 | 30,000 |
| J. Coleman (Officer) | - | - | - | 25,000 | 30,000 |

(*Id.* at ¶¶ 47, 49, 50, 51, 61; D.I. 10, ex. D at 33-34)

### 1. The timing of the challenged grants

Plaintiff alleges that all of the challenged grants were made at times favorable to the recipients. This opportunistic timing allegedly violated the express and fundamental goal of the SIP, which was to encourage management to work towards increasing Masimo's stock price. (D.I. 1 at ¶¶ 46, 48, 67, 86)

With respect to the grants made between 2008 and 2010, plaintiff contends that "the . . . Committee did not make [its] annual stock option grants at any regularly-scheduled, predetermined dates." (*Id.* at ¶ 46) Instead, in each of those years, it allegedly waited for the price of Masimo's stock to drop below "true" fair market value and made the challenged grants while the stock price was still temporarily depressed.

6

(*Id.* at ¶¶ 5, 46) Specifically, the Committee granted options on February 7, 2008 ("the 2008 grant") to Kiani and Lee[4] at an exercise price of $30.79 per share after the stock price dropped 7.65% and 5.13% in consecutive trading days. (*Id.* at ¶¶ 6, 47, 48) Plaintiff contends that the stock price increased soon after the grant, to $31.61 per share on February 14, 2008 and $33.75 per share on February 27, 2008. (*Id.* at ¶ 48)

The following year, on Friday, January 9, 2009, the stock price suffered a one-day drop of 9.08%, opening at $26.18 per share and closing at $23.92 per share. (*Id.* at ¶¶ 7, 49) Plaintiff alleges that the Committee "quickly arranged" to meet that Sunday in order to grant stock options ("the 2009 grant") to Kiani, Lee, de Raad, Fishel, Barker, Cahill, R. Coleman, and Lasersohn at an exercise price of $23.98, before the stock price rose again. (*Id.*) Indeed, plaintiff contends, Masimo's stock price rebounded on the next trading day to $24.38 per share and to $27.50 by the end of the week. (*Id.* at ¶ 49)

The subsequent year, on February 11, 2010, the Committee granted stock options ("the 2010 grant") to the same defendants as in 2009. (*Id.* at ¶¶ 8, 50) These options were awarded by the Committee at an exercise price of $27.25 per share and allegedly with knowledge of favorable financial results and financial guidance that would be released soon after the grants.[5] (*Id.*) Plaintiff alleges that the 2010 grant violated the Compensation Plans for a third straight year and amounted to insider trading. (*Id.*

---

[4]Plaintiff alleges that two other officers who are not defendants in this action, Amar Al-Ali and Michael O'Reilly, also received stock options in the 2008 grant. (D.I. 1 at ¶ 47)

[5]A practice known as spring-loading.

7

at ¶ 50)

According to plaintiff, "the timing and amount of the stock options granted to [d]efendants in 2011 w[ere] even more egregious." (Id. at ¶¶ 9, 51) The Committee made two stock option grants that year, on February 22, 2011 ("the February 2011 grant") and October 27, 2011 ("the October 2011 grant") (collectively, "the 2011 grants"). (Id. at ¶¶ 9, 11) The options in the February 2011 grant were made to all defendants except Fitch and had an exercise price of $30.06 per share. (Id. at ¶¶ 9, 51) Although the stock price increased steadily at first, it eventually declined to $22.32 per share on October 25, 2011. (Id. at ¶¶ 10, 52, 53) The stock price dropped another 10.3% on October 26, 2011, to a near-historic low of $20.02 per share, after the release of disappointing financial results. (Id. at ¶¶ 9, 54-59) This decrease in stock price from $30.06 to $20.02 per share allegedly placed the options from the February 2011 grant "significantly underwater" and made them "virtually worthless;" the likelihood that the recipients would be able to realize any value for the options had been drastically reduced. (Id. at ¶¶ 11, 60, 65)

Plaintiff asserts that, in an effort to replace the unfavorable February 2011 grant, the Committee then made the October 2011 grant with an exercise price of $20.12 per share. (Id. at ¶¶ 10-11, 61, 65, 66) According to plaintiff, the October 2011 grant, "in essence, represented a 'repricing' of stock options" – a practice prohibited by the SIP without shareholder approval. (Id. at ¶¶ 65, 66) The October 2011 grant, like the 2008 and 2009 grants, was allegedly timed to take advantage of a sudden drop in Masimo's stock price. (Id. at ¶ 67) The stock price rose to $21.46 per share within five trading

8

days after the October 2011 grant. (*Id.*) Plaintiff further contends that the October 2011 grant to Kiani and the defendant officers violated the OCP because it was the second grant in 2011, whereas said policy only allows for one "annual grant" of stock options. (*Id.* at ¶ 64)

In sum, plaintiff alleges that the challenged grants were made at opportunistic times, when Masimo's stock was trading at a discount relative to its "true" market value. They were granted either immediately after a sudden large drop in stock price, or just prior to the release of favorable financial information. Furthermore, plaintiff contends that the Committee was not permitted to make the second grant of stock options in 2011 to Kiani and the defendant officers.

### 2. The size of the challenged grants

Plaintiff also claims that the size of the challenged grants to Kiani violated the OCP, which allegedly limits the number of stock options that can be granted to Masimo's CEO to an aggregate of 100,000 per year. (*Id.* at ¶¶ 47, 49, 50, 51, 63, 87) In each of the challenged grants between 2008 and 2010, Kiani received 300,000 options and, in the February October 2011 grants, he received a total of 600,000 options. (*Id.* at ¶¶ 47, 49, 50, 51, 61, 63) Plaintiff further alleges that the February 2011 and October 2011 grants to directors Barker, Cahill, R. Coleman, and Lasersohn surpassed the 20,000 stock options per year allowed under the DCP.[6] (*Id.* at ¶¶ 61, 62) Those directors each received 20,000 stock options per grant in 2011, for a total of 40,000 stock options. (*Id.*)

---

[6]This allegation does not apply to Fitch, who received 20,000 stock options in October 2011 but none in February 2011. (D.I. 1 at ¶¶ 61, 62)

### 3. Excessive and unfair compensation

In addition, plaintiff alleges that the October 2011 grant constituted excessive and unfair compensation to all defendants. With the exception of Fitch, the non-employee directors each received 40,000 stock options in 2011, which was more than what they had each received in the previous two years. (*Id.* at ¶¶ 68-69) Moreover, the total compensation received by each non-employee director in 2011, due in part to the October 2011 grant, was allegedly excessive when compared to prior years, as well as the average director compensation at Masimo's peer companies. (*Id.* at ¶¶ 68, 70-72)

With respect to Kiani and the defendant officers, plaintiff alleges significant increases in their total 2011 compensation, despite Masimo's poor performance at the time. (*Id.* at ¶¶ 73-75) When compared to CEOs at Masimo's peer companies, plaintiff submits that Kiani's 2011 compensation was 24.4% higher than the next highest compensated CEO and more than double the average compensation. (*Id.* at ¶ 76) Plaintiff also relies on a rejection of 2011 officer compensation by Masimo shareholders in an advisory "say-on-pay" vote and a May 25, 2012 report by Institutional Shareholder Service, Inc. Proxy Advisory Services that allegedly criticized a misalignment between Masimo's performance and Kiani's compensation. (*Id.* at ¶¶ 77-82)

### 4. False or misleading statements and omissions

Lastly, plaintiff alleges that the Board made numerous false and misleading statements and omissions concerning Masimo's stock option granting practices, including in proxy statements filed with the Securities and Exchange Commission ("SEC") in April 2009, April 2010, and April 2011. (*Id.* at ¶¶ 13, 83) According to

10

plaintiff, these statements "deceptively conveyed" that Masimo was properly

implementing the Compensation Plans when granting stock options, which statements

were material with respect to shareholders' decisions to reelect the directors each year.

(Id. at ¶¶ 13, 83, 88-89)  In particular, the Board allegedly "failed to disclose how the . . .

Committee chose the dates to grant the 2008-2011 stock options;" falsely and

misleadingly stated that Masimo adhered to "best practices" in option granting;

misrepresented that the challenged grants were made with an exercise price equal to

the fair market value of Masimo's common stock; and deceptively conveyed that the

OCP permitted granting Kiani 300,000 options per year.  (Id. at ¶¶ 84-87)

## III. STANDARD OF REVIEW

### A. Federal Rule of Civil Procedure 23.1

Pursuant to Federal Rule of Civil Procedure 23.1(b)(3), a shareholder bringing a

derivative action must file a verified complaint that "state[s] with particularity:"

(A) any effort by the plaintiff to obtain the desired action from the directors
or comparable authority and, if necessary, from the shareholders or
members; and

(B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1(b)(3).  Therefore, Rule 23.1 provides a heightened pleading

standard.  "Although Rule 23.1 provides the pleading standard for derivative actions in

federal court, the substantive rules for determining whether a plaintiff has satisfied that

standard 'are a matter of state law.'"  King v. Baldino, 409 F. App'x 535 (3d Cir. 2010)

(citing Blasband v. Rales, 971 F.2d 1034, 1047 (3d Cir. 1992)).  "Thus, federal courts

hearing shareholders' derivative actions involving state law claims apply the federal

11

procedural requirement of particularized pleading, but apply state substantive law to

determine whether the facts demonstrate [that] demand would have been futile and can

be excused."[7] *Kantor v. Barella*, 489 F.3d 170, 176 (3d Cir. 2007).

> In this regard, the Delaware Supreme Court has explained that

> the entire question of demand futility is inextricably bound to issues of
> business judgment and the standard of that doctrine's applicability. . . . It
> is a presumption that in making a business decision the directors of a
> corporation acted on an informed basis, in good faith and in the honest
> belief that the action taken was in the best interests of the company.

*Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm*

*v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000). "The key principle upon which this area of

. . . jurisprudence is based is that the directors are entitled to a **presumption** that they

were faithful to their fiduciary duties." *Beam ex. rel. Martha Stewart Living Omnimedia,*

*Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004). Therefore, the burden is on the party

challenging a board's decision to establish facts rebutting the presumption that the

business judgment rule applies. *Levine v. Smith*, 591 A.2d 194, 205-06 (Del. 1991).

By promoting the exhaustion of intracorporate remedies as an alternate dispute

resolution over immediate recourse to litigation, "the demand requirement is a

recognition of the fundamental precept that directors manage the business and affairs

of corporations." *Aronson*, 473 A.2d at 811-12. With this framework in mind, the

Delaware Supreme Court has characterized the exercise of determining demand futility

as deciding whether, under the particularized facts alleged, a reasonable doubt is

created that (1) "the directors are disinterested and independent," or (2) "the challenged

---

[7]Plaintiff's derivative claim in this action is a state law claim.

12

transaction was otherwise the product of a valid exercise of business judgment." *Id.* at

814; *see also Brehm*, 746 A.2d at 256 ("These prongs are in the disjunctive. Therefore,

if either prong is satisfied, demand is excused."). "The spirit that clearly animates [this]

test is a [c]ourt's unwillingness to set aside the prerogatives of a board of directors

unless the derivative plaintiff has shown some reason to doubt that the board will

exercise its discretion [in responding to demand] impartially and in good faith." *In re*

*infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007).

## B. Federal Rule of Civil Procedure 12(b)(6)

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the

sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555; *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint must

contain "a short and plain statement of the claim showing that the pleader is entitled to

relief, in order to give the defendant fair notice of what the . . . claim is and the grounds

upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted)

(interpreting Fed. R. Civ. P. 8(a)). Consistent with the Supreme Court's rulings in

*Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Third Circuit requires a two-

part analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son,*

*Inc.*, 610 F.3d 217, 219 (3d Cir. 2010)*; Fowler v. UPMC Shadyside*, 578 F.3d 203, 210

(3d Cir. 2009). First, a court should separate the factual and legal elements of a claim,

accepting the facts and disregarding the legal conclusions. *Fowler*, 578 F.3d. at 210-

11. Second, a court should determine whether the remaining well-pled facts sufficiently

show that the plaintiff "has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556

U.S. at 679). As part of the analysis, a court must accept all well-pleaded allegations in the complaint as true, and view them in the light most favorable to the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

The court's determination is not whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## IV. DISCUSSION

Defendants move to dismiss the claims related to the 2008 and 2009 grants for being barred by the statute of limitations. Defendants also move to dismiss this derivative action for failure to sufficiently plead that demand would be futile under Rule 23.1 and for failure to state a claim under Rule 12(b)(6). The court addresses each

14

asserted ground for dismissal in turn.

## A. Statute of Limitations

As the Third Circuit explained in *Bethel v. Jendoco Construction Corp.*, 570 F.2d

1168 (3d Cir. 1978):

> Under Fed. R. Civ. P. 8(c), the statute of limitations constitutes an affirmative defense to an action. Under the law of this and other circuits, however, the limitations defense may be raised on a motion under Rule 12(b)(6), but only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations. If the bar is not apparent on the face of the complaint, then it may not afford the basis for dismissal of the complaint under Rule 12(b)(6).

*Id.* at 1174 (citations omitted) (internal quotation marks omitted).

The parties agree that, pursuant to 10 Del. C. § 8106, claims for breach of

fiduciary duty and unjust enrichment are subject to a three-year statute of limitations.

(D.I. 10 at 10; D.I. 13 at 23) Plaintiff filed this action on September 19, 2012 such that

the allegations regarding the 2008 and 2009 grants, on their face, place them outside of

the applicable statute of limitations. Plaintiff argues that he should get the benefit of

tolling because no diligent investor in 2008 or 2009 could have recognized defendants'

pattern of opportunistically timing stock option grants. (D.I. 13 at 25) Defendants

contend that tolling should not apply because plaintiff was on inquiry notice of the 2008

and 2009 grants by February 11, 2008 and January 13, 2009, respectively, when Kiani

publicly disclosed his receipt of those options. (D.I. 15 at 14; *see also* D.I. 10, exs. G &

H)

The statute of limitations may be tolled in three instances. First, under the

doctrine of inherently unknowable injuries, the statute of limitations will not run "where it

15

would be practically impossible for a plaintiff to discover the existence of a cause of action." *In re Tyson Foods Consol. S'holder Litig.* (*Tyson I*), 919 A.3d 563, 584-85 (Del. Ch. 2007). Second, under the doctrine of fraudulent concealment, tolling is appropriate "when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth." *Id.* at 585. Third, under the doctrine of equitable tolling, the statute will not run "while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary." *Id.*

Defendants' reliance on the two public disclosures regarding the 2008 and 2009 grants are insufficient to infer that plaintiff was on inquiry notice of injury soon after those grants were made. The disclosures accurately described the number of options granted, the exercise prices, and the dates of the 2008 and 2009 grants with respect to Kiani only. (D.I. 10, exs. G & H) They did not mention the 2008 grant that Lee received or the 2009 grant that Lee, de Raad, Fishel, Barker, Cahill, R. Coleman, and Lasersohn received. (*See id.*) Moreover, they did not disclose any information, outside of the number, price, and date of options granted, relevant to establishing a practice of favorably timing stock option grants. "It would be inappropriate to infer that plaintiffs were on inquiry notice of injury simply because some relevant information was in the public domain." *Tyson I*, 919 A.2d at 591. Moreover, "partial, selective disclosure – if not itself a lie, certainly exceptional parsimony with the truth – constitutes an act of 'actual artifice' that satisfies the requirements of the doctrine of fraudulent concealment," and misrepresentations in public disclosures may satisfy the doctrine of equitable tolling because "[p]laintiffs were entitled to rely upon the competence and

16

**good faith** of those protecting their interests." *Id.* at 590-91.

Therefore, the court does not find that plaintiffs' claims related to the 2008 and 2009 grants are time-barred at this stage of the proceedings. A plaintiff is not required to plead sufficient facts so as to avoid an affirmative defense based on the statute of limitations. *See Avenarius v. Eaton Corp.*, 898 F. Supp. 2d 729, 740 (D. Del. 2012). Defendants will still be able to present evidence of their affirmative defense at trial to show that the statute of limitations should not be tolled. *See Tyson I*, 919 A.2d at 591 (noting that "defendants [would] have the opportunity [at trial] to present evidence to show that plaintiffs were, in fact, on inquiry notice").

### B. Demand Futility

Plaintiff admittedly did not make any pre-litigation demand on the Board to bring suit, but contends that demand is excused as futile under Delaware law. (D.I. 1 at ¶¶ 90-98) Defendants argue that plaintiff's claims should be dismissed for failure to plead demand futility under Federal Rule of Civil Procedure 23.1. (D.I. 10)

#### 1. Director disinterestedness and independence

Under the first prong of *Aronson*, if the factual allegations raise a reasonable doubt that at least half of a board consists of interested and non-independent directors, the business judgment rule would not protect the board. *See Aronson*, 473 A.2d at 815; *see also In re infoUSA*, 953 A.2d at 990 (noting that, in a case where there are an even number of directors, plaintiff must show that half of the board was incapable of considering demand). There are two ways a director can be deemed "interested" in a transaction. First, "[a] director is interested if he will be materially affected, either to his

17

benefit or detriment, by a decision of the board, in a manner not shared by the corporation and the stockholders." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995); *see also Orman v. Cullman*, 794 A.2d 2, 25 n.50 (Del. Ch. 2002). Materiality is assessed based on a particular director's financial circumstances. *Orman*, 794 A.2d at 23. The second occurs where "a director stands on both sides of the challenged transaction;" this latter way of showing interestedness does not require allegations of materiality. *Id.* at 25 n.50. In contrast, "[i]ndependence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. A director's independence may be challenged by "allegations that raise a reasonable inference that a given director is dominated through a 'close personal or familial relationship or through force of will,' or is so beholden to an interested director that his or her 'discretion would be sterilized.'" *In re infoUSA*, 953 A.2d at 985 (quoting *Orman*, 794 A.2d at 25 n.50; *Beam*, 845 A.2d at 1050).

As a threshold matter, defendants aver that, while the non-employee directors received stock options in some of the challenged grants, they did not stand to benefit from the grants to Kiani and the defendant officers. (D.I. 15 at 3-4) In essence, then, defendants urge the court to apply a separate demand futility analysis with respect to each alleged improper stock option grant to each individual defendant. (*See* D.I. 10 at 11 n.12) (citing *Yaw v. Talley*, Civ. No. 12882, 1994 WL 89019, at *9 (Del. Ch. Mar. 2, 1994); *Needham v. Cruver*, Civ. Nos. 12428, 12430, 1993 WL 179336, at *3 (Del. Ch. May 12, 1993)). However, the cases on which defendants rely for this proposition only

18

applied a separate demand futility analysis for each **claim** in a stockholder derivative action. *See Yaw*, 1994 WL 89019, at *9; *Needham*, 1993 WL 179336, at *3. The court in *Neeham*, for example, rejected an argument that, because certain directors received shares of stock in separate transactions, they were disinterested for the transactions in which they did not receive shares of stock. *Needham*, 1993 WL 179336, at *3. As the *Needham* court noted, "[i]t strains reason to argue that a defendant-director could act independently to evaluate the merits of bringing a legal action against any of the other defendants if the director participated in the identical challenged misconduct." *Id.* Therefore, for purposes of determining demand futility under the first prong, the court analyzes the challenged conduct for each claim, not for each transaction separately.

At all relevant times, the Board consisted of the six directors who are also defendants in this action – Kiani, Barker, Cahill, R. Coleman, Lasersohn, and Fitch. (D.I. 1 at ¶¶ 91, 96) Plaintiff alleges that there is a reasonable doubt as to whether at least half of the Board is disinterested because each director, other than Fitch, received some options in each of the challenged grants between 2009 and 2011, and even Fitch received some stock options in the October 2011 grant. (*Id.* at ¶ 93) Each of the three directors on the Committee allegedly authorized, approved, and granted to himself and the other defendants stock options in violation of the Compensation Plans, and the three directors who were not on the Committee allegedly had the power to act in lieu of the Committee on matters pertaining to the challenged stock option grants but did not do so. (*Id.* at ¶¶ 94-95) Therefore, according to plaintiff, "each [director] has a strong financial incentive to maintain the status quo by not authorizing any corrective action

19

that would devalue his current holdings or cause himself to disgorge improperly obtained stock options." (*Id.*)

Defendants correctly assert that demand is not excused merely because directors received customary compensation for their service as directors. *See, e.g.*, *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988); *Freedman v. Adams*, Civ. No. 4199, 2012 WL 1099893, at *6 (Del. Ch. Mar. 30, 2012). However, the instant case is distinguishable from those cited by defendants, which did not involve challenges to the compensation that directors granted themselves under a shareholder-approved plan. *See Grobow*, 539 A.2d at 188 (analyzing disinterestedness of directors where the challenged transaction was a repurchase agreement); *Freedman*, 2012 WL 1099893, at *6 (discussing only the disinterestedness of non-employee directors who did not receive any financial benefit from the compensation being challenged). The question presented here is different – "whether demand is excused where the challenged decision is the directors' decision to award themselves compensation." *Weiss v. Swanson*, 948 A.2d 433, 448 (Del. Ch. 2008).

When a director receives challenged stock options, he or she stands on both sides of the transaction, and demand is excused without any showing that the options constituted a material benefit. *London v. Tyrrell*, Civ. No. 3321, 2008 WL 2505435, at *5 (Del. Ch. June 24, 2008); *see also Weiss*, 948 A.2d at 441 (excusing demand for lack of board disinterestedness where "all five directors to consider demand received at least some of the challenged option grants"); *Byrne v. Lord*, Civ. Nos. 14040, 14215, 1995 WL 684868, at *4 (Del. Ch. Nov. 9, 1995) ("By alleging that each of the members

of the . . . board has a financial interest in the challenged option plan, Plaintiffs have alleged facts that create a reasonable doubt as to whether the . . . board is independent and disinterested."). There is a reasonable doubt as to the disinterestedness of directors who award themselves the stock options being challenged because these directors "'have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue their current holdings or cause them to disgorge improperly obtained profits.'" *London*, 2008 WL 2505435, at *5 (quoting *Conrad v. Blank*, 940 A.2d 28, 38 (Del. Ch. 2007)).

Plaintiff at bar has pled with factual particularity that each of the directors received at least some of the challenged grants. The three directors on the Committee authorized all of the challenged grants. At a minimum, these three directors stood on both sides of the alleged misconduct underlying plaintiff's claims. In cases where a director stands on both sides of a transaction, no additional showing of materiality is required to raise a reasonable doubt as to director disinterestedness.[8] Therefore, the court finds that plaintiff has raised a reasonable doubt that these three directors were disinterested. As the Committee constitutes half of the Board, the court need not consider the disinterestedness or independence of the other three directors. The court

---

[8]Plaintiff also avers that the directors are incapable of objectively considering demand because each one faces a substantial likelihood of liability. (D.I. 1 at ¶¶ 94-95) "[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Aronson*, 473 A.2d at 815. The court need not address this argument because at least half of the directors are interested for standing on both sides of the challenged transactions.

21

finds that plaintiff has sufficiently pled that at least half of the Board was interested, and demand is excused under the first prong of *Aronson*.

## 2. Exercise of valid business judgment

In addition, plaintiff's pleading satisfies the second prong of *Aronson* – whether the complaint pleads with particularity facts sufficient to create a reasonable doubt that the 2008 grant was the product of a valid exercise of business judgment. The court begins its analysis by presuming that the business judgment rule applies, and plaintiff has to establish facts rebutting this presumption. *Aronson*, 473 A.2d at 812. The business judgment rule applies, however, "only when the terms of [the shareholder-approved plan] at issue are adhered to." *Weiss*, 948 A.2d at 441. "A board's knowing and intentional decision to exceed the shareholders' grant of express (but limited) authority raises doubt regarding whether such decision is a valid exercise of business judgment and is sufficient to excuse a failure to make demand." *Ryan v. Gifford*, 918 A.2d 341, 354 (Del. Ch. 2007); *see also Weiss*, 948 A.2d at 441 ("[A]llegations in a complaint rebut the business judgment rule where they support an inference that the directors intended to violate the terms of stockholder-approved option plans.").

Plaintiff submits that the challenged grants could not have been a valid exercise of business judgment because the Committee, which constitutes half of the Board, granted stock options to defendants in violation of the shareholder-approved Compensation Plans and "masked [the practices] in the yearly Proxy Statements." (D.I. 1 at ¶ 94) Specifically, plaintiff alleges that the purposeful timing of the challenged grants violated the express and fundamental goal of the SIP to encourage management

22

to work towards increasing Masimo's stock price, as well as the prohibition on repricing stock options without shareholder approval. (*Id.* at ¶¶ 102  Plaintiff also claims that the exercise price of the grants violated the requirement for options to be issued at fair market value and that the size of certain grants exceeded the number of stock options permitted under the Compensation Plans.

Defendants contend that the exercise price and size of each challenged grant comported with the Compensation Plans. First, they aver that the SIP defined "fair market value" as the closing price for a share of common stock on the grant date, and the options in each challenged grant were priced accordingly. (D.I. 10 at 21)  Second, they contend that the size of each grant was proper under the proper construction of the Compensation Plans and after taking into account (as the SIP and OCP allegedly require) Masimo's three-for-one forward stock split on June 25, 2007.[9]  (*Id.* at 4, 6-7; *see also id.*, ex. B at F-24)  Defendants' arguments regarding the propriety of the number of options granted boil down to a dispute over the interpretation of the Compensation Plans, which the court need not address at this point.  Rather, the court finds that plaintiff's allegations regarding the improper timing of the challenged grants are sufficient to rebut the presumption that the challenged grants were made pursuant

---

[9]In particular, defendants argue that the DCP does not limit the number of stock option grants to 20,000 per year, as plaintiff claims.  (D.I. 10 at 7)  In the same vein, they submit that plaintiff misinterprets the OCP as setting a "ceiling" on the number of stock options that can be awarded to the CEO per year when, in actuality, it sets a "floor."  (*Id.* at 6)  Accordingly, defendants contend that Masimo's stock split in 2007 increased the number of options required to be awarded to Kiani from 100,000 to 300,000.  (*Id.* at 6-7)  They also assert that the 600,000 options awarded to Kiani in 2011 were well within the ceiling provided by the SIP because it permitted each individual to receive up to 3,000,000 options annually after the stock split.  (*Id.* at 4, 7 n.8, 21)

to a valid exercise of business judgment.

Taking plaintiff's well-pled allegations as true at the motion to dismiss stage, plaintiff has raised a reasonable inference that the directors knowingly and intentionally engaged in a pattern and practice of opportunistically timing option grants. Plaintiff alleges that members of the Committee waited until Masimo's stock was trading below its "true" fair market value to make the challenged grants. This contention is bolstered by specific pleadings that, following all five of the challenged grants, Masimo's stock price allegedly increased rapidly[10] and that, in order to make the 2009 grant, the Committee met on the Sunday immediately following a sudden and historic one-day drop in Masimo's stock price. In addition, the large difference in exercise price between the February 2011 and October 2011 grants supports plaintiff's allegation that the October 2011 grant was a calculated effort to replace, and essentially reprice, the underwater February 2011 grant.

Defendants argue that "[n]othing in the [SIP] prohibits the Board from granting stock options at times of its choosing in the exercise of business judgment." (D.I. 10 at 5) However, the Delaware Court of Chancery has held that, even if a plan gives directors wide discretion in granting options and does not explicitly forbid favorably timed grants, the existence of a scheme in contravention of shareholder expectations is material information that directors have a duty to disclose. *See Weiss*, 948 A.2d at 442 (citing *In re Tyson Foods, Inc. Consol. S'holder Litig.* (*Tyson II*), Civ. No. 1106, 2007WL

---

[10]Even the February 2011 grant was allegedly followed by an initial increase in stock price, although plaintiff claims that a subsequent decline in price made those stock options virtually worthless and prompted the October 2011 grant. (*See* D.I. 1 at ¶¶ 52-53, 60, 65)

24

2351071, at \*4 (Del. Ch. Aug. 15, 2007)). When it comes to executive and director compensation, "shareholders have a right to the full, unvarnished truth." *See Tyson II*, 2007 WL 2351071, at \*4; *see also Weiss*, 948 A.2d at 446-47 (requiring disclosure of the policy of timing option grants). Plaintiff has alleged that Masimo's shareholders had expectations consistent with the express goal of the SIP and that shareholders rejected Masimo's 2011 officer compensation in an advisory "say-on-pay" vote. It is thus reasonable to infer that Masimo's shareholders would consider information regarding the policy of timing stock option grants to be material, e.g., to their approval of the Compensation Plans or reelection of directors. *See Weiss*, 948 A.2d at 443.

Plaintiff has alleged that the directors made numerous misrepresentations and omissions in proxy statements regarding the Committee's policy of timing stock option grants, to the effect of concealing its practice of opportunistically timing stock option grants. For example, the 2012 proxy statement represented that the October 2011 grant to Kiani and the defendant officers was made in lieu of any grant in 2012 (D.I. 10, ex. D at 34), which supports an inference that the directors were trying to mask an improper repricing or second "annual" grant of options. In addition, the Board allegedly failed to disclose how the Committee chose the dates for the challenged grants. Taking the well-pled allegations as true, the directors deceptively conveyed that they were operating pursuant to the express goals and restrictions of the SIP, without disclosing the policy of timing option grants. As the alleged misleading statements and omissions relate to material information, they lead to an inference that the challenged grants had not been made in good faith. Put another way, the directors intended to make stock option grants to circumvent the limitations of the Compensation Plans. *See Weiss*, 948

25

A.2d at 443 (drawing an inference of intent to circumvent a plan based on the board's failure to disclose the timing of option grants in the plan themselves, subsequent proxy statement, and SEC filings); *Ryan*, 918 A.2d at 355 (drawing an inference of "knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures" based on specific language in the option plans, specific public disclosures, and supporting empirical analysis).

In short, plaintiff has alleged with factual particularity the Board's allegedly knowing and intentional decision to exceed the bounds of authority granted by the shareholder-approved SIP, which raises a reasonable doubt that the challenged grants were a valid exercise of business judgment. Therefore, demand is also excused under the second prong of *Aronson*. Defendants' motion to dismiss pursuant to Rule 23.1 is denied.

## C. Failure to State a Claim

### 1. Breach of fiduciary duty

To bring an action premised on the theory that directors breached their fiduciary duties, plaintiff must allege that directors intentionally engaged in bad faith or in self-interested conduct that is not immunized by the exculpatory charter provision permitted by 8 Del. C. § 102(b)(7).[11] *McMillan v. Intercargo Corp.*, 768 A.2d 492, 495

[11]Pursuant to 8 Del. C. § 102(b)(7), the certificate of incorporation may contain:

A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a

26

(Del. Ch. 2000); *see also Malpiede v. Townson*, 780 A.2d 1075, 1094 (Del. 2001).

As discussed *supra*, plaintiff's allegations, taken as true, sufficiently rebut the presumption that the business judgment rule applies. Specifically, plaintiff has pled particularized facts that give rise to an inference that the directors intentionally violated the Compensation Plans, which would be a breach of the fiduciary duty of loyalty. Because the standard under Rule 12(b)(6) is less stringent than that for pleading factual particularity under Rule 23.1, "where [a] plaintiff alleges particularized facts sufficient to prove demand futility under the second prong of *Aronson*, that plaintiff a fortiori rebuts the business judgment rule for the purpose of surviving a motion to dismiss pursuant to Rule 12(b)(6)." *Ryan*, 918 A.2d at 357; *see also Weiss*, 948 A.2d at 448; *McPadden v. Sidhu*, 964 A.2d 1262, 1270 (Del. Ch. 2008).  Therefore, plaintiff sufficiently pleads breach of fiduciary duty.

### 2. Unjust enrichment

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (citation omitted) (internal quotation marks omitted).  It requires: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy at law." *Id.*  Defendants argue that the challenged grants were justified and that plaintiff has an adequate remedy at law.  (D.I. 10 at 26-27)

---

knowing violation of law; . . . or (iv) for any transaction from which the director derived an improper personal benefit.

27

At the motion to dismiss stage, the court is unable to conclude that there is no conceivable set of circumstances under which defendants unjustifiably retained something of value. Moreover, the court cannot conclude at this time that plaintiff's breach of fiduciary duty claims provide an adequate remedy at law to bar plaintiff from also asserting unjust enrichment. In fact, the Delaware Court of Chancery has held that a breach of fiduciary duty, if successful, may help a plaintiff prove a claim for unjust enrichment. *See Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 394 (Del. Ch. 1999) ("If Plaintiffs succeed on the merits of their breach of fiduciary duty and aiding and abetting claims, it is likely they will also be able to prove that neither [defendant] can retain any benefit resulting from the disputed transaction 'justifiably' or in accordance with 'the fundamental principles of justice or equity and good conscience.'"). Therefore, plaintiff sufficiently pleads a claim for unjust enrichment, and defendants' motion to dismiss under Rule 12(b)(6) is denied in this regard.

## V. CONCLUSION

For the foregoing reasons, the court denies defendants' motion to dismiss. An appropriate order shall issue.

28